41 A.3d 502 (2012)
In re C.L.O.;
E.P., Appellant and
In re A.H.;
E.P., Appellant.
Nos. 11-FS-727, 11-FS-898.
District of Columbia Court of Appeals.
Argued December 14, 2011.
Decided April 12, 2012.
*504 Thomas C. Devlin, Washington, DC, appointed by the court, for appellant E.P.
Anthony C. Biagioli, with whom Paul M. Schoenhard, Washington, DC, was on the brief, for appellee C.L.O.
Murphy B. Henry, appointed by the court, filed a statement in lieu of brief for appellee K.H.
Monica A. Myles, appointed by the court, Guardian ad litem for appellee A.H., filed a statement in lieu of brief.
Stacy L. Anderson, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, and Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief, for appellee the District of Columbia.
Before GLICKMAN and OBERLY, Associate Judges, and FERREN, Senior Judge.
FERREN, Senior Judge:
This case presents the challenge by an unwed, noncustodial fatherwho was unaware of his child at birthto the adoption of his child by her foster parent with the consent of the natural mother. After finding that clear and convincing evidence supported a court-ordered waiver of the father's required consent in the child's best interest, the trial court ordered the waiver and granted the adoption. Perceiving no abuse of the court's discretion, we affirm.[1]

I. Statement of Facts and Proceedings
Beginning in the winter of 2006-2007, E.P. had a sexual relationship with K.H. The relationship ended after seven or eight months because E.P. disapproved of K.H.'s drinking habits. Not long thereafter, on October 6, 2007, K.H. gave birth to A.H.
For the first three months of her life, A.H. lived with her mother in homeless shelters. On January 28, 2008, the District's Child and Family Services Agency (CFSA) removed A.H. from her mother's care. On January 31, CFSA filed a petition *505 for neglect, and A.H. was committed forthwith to the agency for placement in foster care.[2] On March 28, a magistrate judge granted the government's motion for constructive service of process on the unknown father, and a notice was posted on March 31 in the Juvenile and Neglect Clerk's Office for a period of two weeks stating "that a neglect proceeding has been scheduled" for A.H. "born to [K.H.] on October 6, 2007." The notice ordered the unknown father to appear at the next scheduled hearing, with date and time provided, adding that he had a right to seek custody of the minor child, that he had a court-appointed attorney, and that failure to respond to the notice could result in the court proceeding without the father being present.
Five weeks later, on May 7, K.H. stipulated before the magistrate judge that her daughter, then seven months old, was a neglected child, and the judge entered an order to that effect. K.H. also submitted an affidavit of paternity that identified the father as either a man named E. or a man named N. She was unable to provide last names or any other identifying information, but she said that she could point out addresses where these men could be found.
District of Columbia law requires a hearing, within one year after a child's entry into foster care, to determine a plan for the child's permanent custody.[3] Accordingly, on May 21, 2008, the magistrate judge confirmed that the permanency goal was reunification of A.H. with her mother, K.H., and ordered the provision of appropriate social services to facilitate that goal. Three months later, on September 3, the magistrate judge reiterated that the permanency goal was reunification but recognized that the case was likely to move toward guardianship or adoption. Were that to happen, the natural father would have to either claim or waive his right to custody;[4] thus, the judge asked the parties to launch an effort to locate A.H.'s father. Thereafter, social workers were often unable to reach K.H., who also missed two appointments with the investigator assigned to locate the father. A court-appointed counsel for the unknown father also hired an investigator, who was unsuccessful in finding the father.
At a hearing on December 8, 2008, the magistrate judge ordered the permanency goal changed from reunification to adoption, and on January 16, 2009, a motion was filed[5] to terminate the parental rights of both K.H. and the child's father. Sometime in January, if not earlier, the petitioner, C.L.O., expressed an interest in adopting A.H., who was moved, as a result, from her first foster home to C.L.O.'s care on January 25. The child was a little over one year old. C.L.O. brought A.H. to medical and dental appointments, as well as to developmental, language, and speech assessments. Over the course of a year, social workers expressed satisfaction at several status hearings that, under C.L.O.'s care, A.H. was thriving and on target developmentally.
C.L.O. filed a petition for adoption on *506 October 19, 2009,[6] when A.H. had just turned two years old. K.H. received a notice of the petition within a few days, and efforts were made to serve notice on a man named E.T. (not E.P.) and another named N. Meanwhile, as he acknowledged later at trial, E.P. had learned from his cousin some two months earlier, in August 2009, that "K. had the baby and that K. wanted [E.P.] to come and get the baby." E.P. further testified that he then knew "it might have been a possibility" that the baby was his child, and that he decided to seek out K.H. to "see what the problem was since she said [to his cousin] she couldn't handle ... having the baby." Not knowing where to find K.H., E.P. initially relied on his cousin to contact her. He waited two weeks for his cousin to report back; he heard nothing from her. E.P. then went with his cousin to K.H.'s grandmother's house.[7] He learned from K.H.'s family that she had left the house with her baby, implying that she would return. E.P. returned to the grandmother's house three or four more times over the next "month or less," without finding K.H. or the baby there. He made no further effort to find mother or child.
At the next hearing on January 26, 2010, K.H. consented to A.H.'s adoption. Arrangements were made once more for K.H. to accompany a CFSA investigator, who was also a process server, to try to locate A.H.'s father. This time they succeeded. E.P. was served with a notice for termination of parental rights (TPR) on January 28five months after he had learned about the childand with a notice of the proposed adoption a month later on February 23. E.P. maintains that he had been unaware that A.H. was in a foster home until he was served with the TPR notice in January, and that he had not been certain the child was his until a DNA test confirmed his paternity in March 2010. Immediately after the DNA result, E.P. said, he contacted CFSA. Without waiting for a court order, the agency arranged for E.P. to have two, one-hour supervised visits with A.H.
E.P. attended the next scheduled status hearing on March 25, 2010 and notified the magistrate judge that he wished to work toward gaining custody of his child. Because E.P. had just been identified as the father, the judge chose to maintain the goal of adoption. However, he deferred a hearing on the adoption petition, giving the parties additional time to discuss their respective positions. Taking into account the child's young age and the absence of information about E.P.'s ability to care for her, the magistrate judge formalized E.P.'s visitation rights with an order allowing supervised visits of at least one hour each week, and he granted CFSA, the guardian ad litem, and the foster mother (C.L.O.) discretion to determine together whether to permit unsupervised visits.
Four months later on July 26, 2010, having failed to obtain permission for unsupervised visits, E.P. filed a motion for unsupervised visitation and for appointment of an independent social worker. *507 The magistrate judge denied the motion as well as a motion to reconsider. The judge held a permanency hearing on September 14, at which E.P. withheld his consent to A.H.'s adoption.
On October 14, 2010, the magistrate judge convened a show cause hearing[8] to evaluate whether the court, in the child's best interest, should waive the statutory requirement for E.P.'s consent to the adoption. By that time, A.H. had just turned three years old. She had been in foster care for all but three months of her life, and the petitions for TPR and adoption had been pending for nine months and eight months, respectively. The parties presented extensive evidence over the course of four days, including testimony from C.L.O. and E.P., as well as from three of E.P.'s daughters (by other mothers); the mother of one of his daughters; E.P.'s own mother; four social workers who had been supervising the case; A.H.'s daycare teacher; a child psychiatrist; and a clinical psychologist.
C.L.O. testified that she has a bachelor's degree, as well as a master's degree in social work, from Howard University. She has been employed by CFSA as a supervisory social worker for twenty years. C.L.O. has one biological teenage daughter for whom she has always been the primary caretaker. She lives with L.A.L., her daughter's biological father, and she owns her home. She was forty-nine years old at the time of the hearing, she said, and was in good health except for high blood pressure controlled by medication.
C.L.O. then testified about the close relationship A.H. has developed with C.L.O. and her family. A.H. refers to C.L.O. as "mom." She refers to C.L.O.'s biological daughter as her sister or her best friend. L.A.L. and A.H. have a positive relationship, and A.H. refers to L.A.L. as her "daddy." C.L.O. further testified that she believed removal of A.H. from her home would be "traumatic" for the child. C.L.O. also testified that, if the adoption were approved, she would agree to allow E.P. to develop a relationship with his daughter, beginning by inviting him to holidays and special events and then giving A.H. more freedom to decide when to meet with her father as she gets older.
A.H.'s daycare teacher testified that A.H. was a healthy and active child, with no behavioral problems, good hygiene, excellent attendance, and good communication and social skills. She described C.L.O. as "very attentive" to A.H.'s needs. Emily Colebrook, one of the CFSA social workers, testified that "C.L.O. took every step that was recommended" for A.H.'s care and "really went above and beyond to make sure [A.H.] continued to progress." Ms. Colebrook added that C.L.O. and L.A.L. had a very positive relationship with A.H.; the relationship was trusting, nurturing, loving, and marked by appropriate disciplinary boundaries.
Kathryn King, a supervisory social worker, testified about the attentive care that C.L.O. was providing and stressed the bond that had developed between A.H. and her pre-adoptive family. Ms. King further testified that she believed it would be devastating for A.H. to be removed from C.L.O.'s home because "she's totally bonded to [C.L.O.]'s family, her biological daughter, her boyfriend [L.A.L.]. She's that's her family." Carolyn Nicholson, a third CFSA social worker, testified similarly about the positive relationship between A.H. and C.L.O., stating that A.H. appeared to be "fully integrated into that foster family." On the other hand, a fourth CFSA social worker, Marie Cohen, *508 testified about the positive nature of E.P.'s visits with his daughter and stated that she was not comfortable with the permanency goal of adoption.
The magistrate judge then heard testimony from E.P. that he was unemployed at the time of the hearing but was actively seeking employment, and that his income consisted of unemployment compensation, food stamps, and payments for odd jobs. At the time of the hearing, E.P. lived with his mother, for whom he provided some financial support. E.P. was fifty-five years old at the time of the hearing and in good health, with the exception of high blood pressure controlled by medication.
E.P. testified that he has had seven children (including A.H.) with five different women, and that he was "always very active with [his] kids," having a "good relationship" with each. E.P. acknowledged, however, that he did not know what his eldest son (aged thirty-six and living in Wisconsin) "was up to." E.P.'s second and third sons were killed at a young age following involvement in criminal activity. None of E.P.'s sons finished high school.
E.P.'s eldest daughter, D.P.W., was thirty at the time of the hearing. She testified that E.P. had lived with her mother until D.P.W. was five years old and that he had been engaged in her upbringing. She also lived with E.P. for five months when she was fourteen, after becoming pregnant. E.P.'s second daughter, E.J., testified that she had spent many weekends with her father growing up and that he had provided her with necessities such as school supplies. Neither D.P.W. nor E.J. finished high school, but they have since obtained General Equivalency Degrees (GEDs) and job training.
According to E.P.'s third daughter, S.C., E.P. maintains a close relationship with her and participates in her high school education. S.C.'s mother stressed that, with the assistance of family members and hired nurses, E.P. had cared for S.C., as well as S.C.'s five siblings, for a number of years immediately following S.C.'s birth when S.C.'s mother was seriously ill. S.C.'s mother testified that during this time E.P. "would cook, he would wash the clothes, help with the kids, take them out to play." E.P. testified that he had paid child support for one of his seven children and provided for them informally when needed.
The magistrate judge learned from a social worker that E.P. had not missed a single visit with A.H., who had responded positively except on one occasion, when she exhibited an unusual reluctance to engage with him. E.P. brought his daughter a snack for each visit, as well as a basket for Easter; cake, ice cream, and a doll for her birthday; and clothing on another occasion. After a number of visits, A.H. began referring to E.P. as "daddy." E.P. testified that he hoped A.H. could gradually experience a transition to his custody, but he was not able to articulate a plan for her care if he were to obtain custody. He added that A.H. would reside with him at his mother's home along with his seventy-year-old mother and a "Cousin James."
At the hearing, E.P. acknowledged that he had a criminal record. In 1991, he pled guilty to attempted carnal knowledge, and a year later he pled guilty to simple assault. E.P. had earlier failed to come forward with information about the attempted carnal knowledge conviction when social workers asked him to disclose prior convictions, if any. Two of the social workers testified, accordingly, that they had refused to grant E.P. unsupervised visits with A.H. because they had been concerned about his judgment and character.
Finally, a child psychiatrist, Dr. Susan Thuet, and a clinical psychologist, Dr. *509 Charles Missar, offered expert clinical opinions about A.H.'s respective attachments to C.L.O. and E.P. Dr. Thuet testified that the strongest aspects of attachment are witnessed from birth to about three and a half years old, a period when the risks associated with breaking attachmentssadness, crying, irritability, and sleep problemsare the greatest. Based on her observation of A.H. with C.L.O., and then with E.P., during two consecutive, forty-five minute "attachment" studies, Dr. Thuet testified that in her clinical opinion A.H. had developed positive attachments of equal strength to C.L.O. and E.P. She added that she believed A.H. would be sad and distressed to leave her pre-adoptive home with C.L.O.'s family, and that there was a risk of long-term psychological harm in doing so that would turn on a number of factors, including the nature of the relationship A.H. developed in a different home, the results of therapy, and A.H.'s own constitution. She testified, however, that the psychological harm to A.H. would be the same if she were no longer permitted to interact with E.P. because "the strength of the attachment ... between her and her father was very significant."
Dr. Missar's testimony differed from Dr. Thuet's, including his distinction between a "bond" and an "attachment." Dr. Missar defined a psychological attachment as "much deeper than a bond relationship." He stated that the short-term consequences of breaking an attachment for a child under four to five years old include "emotional regression" and a likelihood that the child will "cry, break down, have temper tantrums, act out." The long-term consequences include having "trouble reattaching to people." He agreed that the first four years of a child's life were the most critical with regard to the development and maintenance of attachments. Dr. Missar further testified that, based on his review of background materials as well as Dr. Thuet's report, A.H. had developed a positive bond with E.P. and that breaking that bond would have an emotional impact on A.H. But he stressed that in his clinical opinion A.H. had developed a more profound relationship with C.L.O.an attachmentand that breaking that attachment would lead to immediate emotional regression and a likelihood of long-term emotional complications.
In both opening statement and closing argument, counsel for C.L.O. maintained that E.P. had not "embrace[d] his parental responsibilities with sufficient urgency and enthusiasm" to support "any presumptive evidentiary weight to which he may otherwise be entitled." Counsel argued, in addition, that C.L.O. had satisfied the clear and convincing evidence standard entitling her to adopt A.H. Counsel for the government agreed. A.H.'s guardian ad litem argued that E.P. had seized his constitutional "opportunity interest" but that the adoption would nonetheless be in the child's best interest. The guardian explained that "[i]t's unfortunate how the events transpired, but the child already has a family, and I don't see any reason for that family relationship to be disrupted at this point."
On November 18, 2010, the magistrate judge found by clear and convincing evidence that, in the best interest of A.H., the court would waive E.P.'s consent to adoption. On March 9, 2011, the judge issued written Findings of Fact, Conclusions of Law, and Order Waiving Consent of Biological Father. The final decree of adoption was issued the same day by another magistrate judge in chambers, and E.P. filed a timely motion for review. On May *510 23, 2011, the trial judge,[9] after reviewing the record,[10] affirmed the final decree and all preliminary orders. E.P. filed a timely notice of appeal.

II. Standard of Review
The trial judge reviewed the magistrate judge's findings, conclusions, and final order, applying the same standard of review as this court would apply on appeal of a judgment or order of the Superior Court.[11] Accordingly, the trial judge reviewed the magistrate judge's order for errors of law, abuse of discretion, or clear lack of evidentiary support,[12] and affirmed. We, in turn, review the trial judge's order.[13]
Although "[w]e are mindful that from a procedural standpoint, our role is to review the order of the [trial] judge, not the magistrate judge, ... we do not believe our powers of appellate review are so limited that, in reviewing the trial court's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based."[14] Therefore, we review the magistrate judge's factual findings as the findings of the trial judge and review for "abuse of discretion or a clear lack of evidentiary support."[15] As to alleged errors of law, however, we review the record de novo, without deference to the judges below.[16]
"The determination of whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion."[17] We therefore review the court's order for abuse of discretion, "`determining whether the trial court exercised its discretion within the range of possible alternatives, based on all the relevant factors and no improper factors.'"[18] "In so doing, `we ... evaluate whether its decision is supported by substantial reasoning drawn from a firm factual foundation in the record.'"[19]

III. Applicable Law
As a general rule, the trial court may not grant a petition for adoption of an infant child without a written statement of consent from the child's living parents, both the natural mother and the natural father.[20] The court, however, after a hearing, may waive this required parental consent upon a finding that consent is "withheld contrary to the best interest of the *511 child."[21] "Where a biological parent declines to consent to a proposed adoption, the prospective adoptive parent must ordinarily show by clear and convincing evidence that consent is being withheld contrary to the child's best interest."[22] The "best interest" determination requires the court to apply the same factors used in a proceeding to terminate parental rights.[23] Three of those factors are relevant here:[24]
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parents, siblings, relatives, and/or caretakers, including the foster parent;
The court must apply these factors with full recognition of the "gravity of a decision whether to terminate parental rights."[25] The court therefore begins by recognizing "the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit."[26] Even for fit fathers, however, there is a limitation. The court will invoke the presumption or preference[27] in favor of a fit, unwed, noncustodial father only when the court finds that he timely grasped his constitutional "liberty" interestnow commonly called his "opportunity interest" protected by due process.[28] That is to say, *512 the father must have "early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue that interest" in developing a custodial relationship with his child.[29]
When a fit, unwed, noncustodial father has seized his opportunity interest, his resulting right to presumptive custody "can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons."[30] But suppose the same father has failed to seize his opportunity interest, yet opposes the adoption of his child. Does the trial court employ the same standard for terminating the father's parental rights, namely, whether clear and convincing evidence demonstrates that he is withholding his consent contrary to the child's best interest? This court has not expressly addressed this question, and, as we shall see, we need not answer it here. From the trial judge's review, we discern that she reached conclusions in the alternative: that (1) based on subsidiary facts found by the magistrate judge, E.P. had surrendered his opportunity interest, but that (2) even though the magistrate judge did not mention E.P.'s opportunity interest in the written findings of fact and conclusions of law, the record supplied clear and convincing evidence supporting the waiver. A majority of the division agrees that we need not address the first alternative, because the majority agrees that even if E.P. did grasp his opportunity interest, the court-imposed waiver of his consent to the adoption was supported by clear and convincing evidence.[31] We turn, therefore, to our explanation.

IV. The Child's Best Interest
Both the magistrate judge and the trial judge found clear and convincing evidence that C.L.O.'s adoption of A.H., facilitated by a court-imposed waiver of E.P.'s right to consent, was in the child's best interest. We turn to the applicable statutory criteria, beginning with the first of the three applicable factors.[32]

(1) The child's need for continuity of care and caretakers and for timely integration *513 into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages.

E.P. argues that the evidence shows "he would provide a stable, loving home for A.H." This may be true, but his contention neglects to consider the child's need for "continuity of care" and "timely integration" into a home that is not only "stable" but also "permanent."[33]
Record evidence supports the magistrate judge's findings that A.H. has been removed twice from her primary caretakeronce from her biological mother and then from her first foster home; that A.H. has lived with C.L.O. since January 25, 2009 and has been a member of C.L.O.'s family "for more than half of her short life"; that C.L.O. has been the primary care provider for her biological daughter since the child's birth in 1997; and that E.P., to the contrary, has not been the primary care provider for any of his seven children, except during brief periods. The magistrate judge credited the testimony of both expert witnesses that A.H. would "suffer significant emotional harm if she were removed from the care of C.L.O." The judge also noted that "the social workers and the child's guardian ad litem" supported the adoption.[34] Indeed, the guardian ad litem stated during closing argument with respect to this first factor that "[i]t's unfortunate how the events transpired, but the child already has a family, and I don't see any reason for that family relationship to be disrupted at this point." The record supports the magistrate judge's conclusions of law that A.H. has a "secure and loving" relationship with C.L.O.; that C.L.O. has demonstrated her ability to provide stability and permanence; that E.P. has not demonstrated this same ability; and that removing A.H. from her pre-adoptive, foster home would cause her to "suffer substantial harm." Accordingly, the trial judge did not err in finding by clear and convincing evidence that this factor should be weighed in favor of adoption.
(2) The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child.
In applying this factor, a trial judge may consider whether breaking a child's secure attachment to the pre-adoptive foster parent would have a negative impact on the child's physical and mental health.[35] The judge may also consider a parent's emotional maturity, parenting skills, and ability to meet the emotional needs of the child.[36]
The magistrate judge found that, overall, both E.P. and C.L.O. were in good physical health. He credited the testimony of both expert witnesses that A.H. would suffer emotionally if her attachment to C.L.O. and C.L.O.'s family were broken. He found that A.H. "would not suffer nearly the same emotional trauma if she has decreased contact with her father in the coming months and years, given the limited nature of their relationship." He credited *514 C.L.O.'s testimony that she would allow some ongoing contact between A.H. and E.P.
The magistrate judge also made a number of findings regarding the parenting skills of the two parties. He found that E.P. had fathered seven children, two of whom died following involvement in criminal activity and most of whom had not finished high school. He further found that E.P. had provided child support for only one of his seven children. He found that E.P. had been convicted of attempted carnal knowledge and simple assault on separate occasions and that E.P.'s "involvement in criminal activity demonstrates significant problems with his judgment."[37] The magistrate judge then found, based on the evidence and the demeanor of the parties, that "C.L.O. will be a much more reliable, dependable, and responsible care provider for [A.H.] than [E.P.]." These findings of fact are supported by the record and, taken together, support a finding by clear and convincing evidence that A.H.'s mental and emotional needs would be better served by remaining in C.L.O.'s custody.
(3) The quality of the interaction and interrelationship of the child with his or her parents, siblings, relatives, and/or caretakers, including the foster parent.
The magistrate judge entered three findings relevant to this third factor: A.H. had lived with C.L.O. since January 25, 2009; E.P. first visited A.H. on March 17, 2010 and participated in regular weekly visits thereafter; and A.H. has a "warm, loving relationship" with C.L.O.'s biological daughter and her daughter's father [L.A.L.] and has been accepted as a member of that family. The judge discussed "the substantial testimony about the secure and loving emotional connection between [A.H.] and C.L.O., whom [A.H.] refers to as `Mommy.'" In addition, he credited the testimony of Dr. Missar that A.H. "would suffer far more serious emotional harm if she were separated from C.L.O. than if she were separated from [E.P.]," as well as "his testimony that the attachment between [A.H.] and C.L.O. is far more significant to [A.H.] than [her] relationship with [E.P.]" The magistrate judge summarized: "It is quite clear that the child's relationship to C.L.O. is far more developed than her relationship with her father."
E.P. argues that the magistrate judge should have credited not Dr. Missar's testimony but that of Dr. Thuet, who testified that the harm to A.H. would be as great from leaving E.P. as from terminating her relationship with C.L.O. However, "`as a general proposition, when faced with conflicting expert testimony, the trial court may credit one expert over the other, or disregard both in rendering its judgment.'"[38] The magistrate judge's finding that favors Dr. Missar's testimony over *515 that of Dr. Thuet is supported by the record.[39] Assessment of the demeanor and persuasiveness of competing expert witnesses is a primary role of the trial judge, and this court will not "redetermine the credibility of witnesses" when the trial judge has had an "opportunity to observe their demeanor and form a conclusion."[40]
At the time of the hearing, C.L.O. had provided for A.H.'s every daily need for almost two years, while E.P. had diligently attended every scheduled visit with his daughter. But E.P.'s visits consisted of no more than weekly structured visits of an hour and a half at the offices of the social workers for a period of eight months. Based on the length and quality of these interactions, the magistrate judge did not abuse his discretion in finding by clear and convincing evidence that "the quality of the interaction and interrelationship" of A.H. with C.L.O. and her family was substantially greater than the quality provided by E.P. and thus weighed in favor of A.H.'s adoption.

V. Conclusion
The trial judge upheld the magistrate judge's order after a careful review, ruling that his findings were supported by the record. Furthermore, based on the assumption that E.P. had grasped his constitutional opportunity interest, the trial judge ruled that clear and convincing evidence required waiver of E.P.'s consent and supported adoption by C.L.O. in the best interest of A.H. In reviewing both judges' decisions, we have "`evaluate[d] whether [the] decision is supported by substantial reasoning drawn from a firm factual foundation in the record.'"[41] We conclude that the court did not abuse its discretion in ruling that E.P. withheld his consent to the adoption of A.H. contrary to the child's best interest, and thus in entering a final decree granting the adoption of A.H. by the petitioner-appellee, C.L.O.
Affirmed.
GLICKMAN, Associate Judge, with whom OBERLY, Associate Judge, joins, concurring:
In view of Judge Ferren's concurring opinion, I write separately to explain why the panel majority refrains from deciding (1) whether E.P. grasped his opportunity interest in parenting A.H., and (2) the applicable standard of proof in the adoption proceeding (clear and convincing evidence or preponderance of the evidence) if he did not. It is unnecessary to decide either question because we uphold the trial court's determination by clear and convincing evidence that E.P. withheld his consent to the adoption contrary to the best interest of A.H.
As a legal matter, whether E.P. grasped his opportunity interest is relevant to whether he was entitled to due process and a legal presumption in favor of placing A.H. with him because he is her biological parent.[1] But in this case we are not presented with any issue of due processE.P. undeniably received all the due process to which he could have been entitled, including the clear and convincing evidence standard of proof.[2] For that same reason, *516 E.P. received the full benefit of the presumption in favor of a fit biological parent. When that presumption applies in an adoption proceeding, all it means is that waiver of the biological parent's consent requires proof of the child's best interest by clear and convincing evidence rather than a mere preponderance of the evidence.[3]
To be sure, a father's efforts (or lack thereof) to establish and maintain a parental relationship with his child are factually relevant to whether clear and convincing evidence establishes that he is withholding his consent to adoption contrary to the child's best interest. But there is no question that the trial court properly considered E.P.'s efforts as part of the totality of relevant facts in this case. Because the court assumed that E.P. was entitled to a parental preference and properly applied the clear and convincing evidence standard in light of the relevant TPR factors and our case law, it makes no difference that the court made no formal legal determination as to whether E.P. grasped his opportunity interest.
As to the second question we do not decide, the parties to this appeal did not even brief whether our statutory scheme (as distinct from due process) requires a trial court to apply the clear and convincing evidence standard of proof in deciding whether to waive the biological father's consent to adoption if he did not grasp his opportunity interest. This court's previous cases have not decided that precise questionthough waiver of consent usually is bound up with a concurrent termination of parental rights, and the statute governing termination of parental rights of neglected children appears to require clear and convincing evidence that termination is in the child's best interest whether or not the father grasped his opportunity interest.[4] Assuming, as Judge Ferren argues, that our statutory scheme also requires a waiver of parental consent to adoption to be supported by clear and convincing evidence in every case, I perceive no need for the trial court in adoption proceedings ever to make a separate finding as to whether the unwed, noncustodial father grasped his opportunity interest. As I see it, that determination has no legal significance under our statutory scheme if the same standard of proof is required either way it turns out.
FERREN, Senior Judge, concurring in the result:
I add this concurring opinion because, in my judgment, the opinion of the court does not address, in satisfactory detail, E.P.'s claim that he grasped his constitutional "opportunity interest"[1] and thus is entitled to presumptive permanent custody of his daughter, A.H.

I.
Termination of parental rights is a very serious decision, often traumatic and always sad for one or more of the persons involved. The consequences are many, affecting the parent, the child, often the other parent and relatives, the District of Columbia and its courts as parens patriae, and in some cases, like this one, a pre-adoptive family. Thus, the question whether an unwed, noncustodial father *517 hasor has notgrasped his constitutional opportunity interest in assuming custody of his child can be of extraordinary significance in determining whether the child ultimately will remain with the father. If the father, otherwise fit, has grasped that interest, the law gives him a preferencea presumptive right to custody. If he fails to grasp it, however, he loses that presumption, a loss that, as time passes, significantly diminishes his chance to gain custody, especially if the child, as in this case, is living in foster care with a pre-adoptive parent.
Therefore, when a father is confronted with a termination proceedingincluding a proceeding for adoption when the court has to decide whether to waive, against his will, the father's statutory right to consentit is of unquestionable importance that the trial court pay very careful attention to this "opportunity interest" issue, making careful findings that justify the decision. The ruling on the preference, "yes" or "no," coupled with a lucid explanation, is crucial, I believe, for fairness to the father. And, of significance as well, the elaborated ruling is necessary to serve the appearance of justice overall.
Given the gravity of the court's decision, I am not satisfied with an approach that simply assumes the opportunity interest is intact and then proceeds to weigh the competing claims to custody. In the first place, an assumed opportunity interest can be used only when the court is going to find clear and convincing evidence that the father should not keep his child. Paradoxically, therefore, this device creates the appearance of a judicial failure to pay adequate attention to this potentially determinative issue. Because terminations of the parental rights of unwed, noncustodial fathers are not uncommon, the mere assumption that the opportunity interest remains intact in lieu of detailed findings to that effect is likely to appear to be a shortcut to the inevitable termination of rightsindeed, a shortcut perceived cynically as an insincere makeweight toward termination.
This may be particularly true where allegations of state action or interference by the mother or other family members, despite assertive, continuing efforts by the father to develop a relationship with his child, should alert the court to the possibility that the noncustodial father has grasped his opportunity interest. Such a scenario may well suggest that the father should acquire custody, despite the child's bonding with a pre-adoptive familya result that could too easily remain unexplored in a court's ruling to the contrary after merely assuming the father's custodial preference.
Obviously detailed findings may lead, perhaps more often than not, to a ruling that the father has failed to grasp his opportunity interest, a message at odds with the ostensibly better news that an assumed opportunity interest conveys. But, as I see it, that assumed custodial preference offers the father little, if any, good news when he learns that his rights are to be terminated nonetheless. Better to spell out the truth in every case than create false impressions on the way to disposition.
This is not to say that judges who employ an assumed preference for the father actually fail to give the question careful attention; to the contrary, I have every confidence that they do. But a procedure that commonly embraces the "assumption" approach does not invite the kind of confidence in the result that detailed findings will bring, whether for or against the father.
The foregoing analysis, calling for a merits ruling with findings on a father's opportunity interest, addresses essentially *518 an appearance problem that an objective, outside observer would likely identify. But there is also a compelling subjective reason for treating the opportunity interest with care: the perception of the father himself. When the trial court assumes a custodial preference for the father, and then finds clear and convincing evidence sufficient to terminate his parental rights in favor of an adoptive family, the father may understand that he has been given the benefit of a constitutional rightand yet lost. But he may be more likely to understand, if not accept, the ultimate result if the trial court comes to grips with his opportunity interest by spelling out whatever positives there may have been that cut in favor of the preferenceeven though in the end he does not prevail on the claimed preference and, for that and other reasons, he is unable to acquire custody of his child. He will at least have been assured, more completely than a mere assumption would warrant, that the court has taken his case into account in full, without any shortcut that might have ignored important evidence. Given the significance of cutting off a natural parent's right to custody, I believe that a father's enhanced understanding of the result, beginning with detailed examination of his opportunity interest, may help with his acceptance of an adverse ruling, even though the trial judge would have been correct, given the record, in granting an adoption on the mere assumption that the father's opportunity interest had remained intact.
Finally, timemeaning delayis often at the heart of child custody decisions as bonding begins to occur between a child in foster care and the pre-adoptive family. There may be cases in which the trial court, either by failing to address the opportunity interest or by merely assuming the father has grasped it, risks reversal because this court cannot conclude that clear and convincing evidence supported the adoption if the father's custodial preference remains in place.[2] In either situationomission or assumptionthis court will not be able to rule on the adoption absent definitive resolution of the father's claimed opportunity interest. A magistrate judge, therefore, should not chance a time-wasting remand for consideration of an opportunity interest that could have been resolved in the initial proceeding. (There may be still other cases in which the trial court does rule on the opportunity interest, concluding that its resolution is, or is not, outcome-determinative, and this court disagrees. But that possibility does not negate the necessity for initial fact-finding.)
I am under no illusion that every father will find solace in the kind of trial court attention to his opportunity interest that I am recommending here. I am not even sanguine about how many fathers, for whom terminations of parental rights are sought, are invested in taking responsibility for their children. My point, therefore, is simply this: there are noncustodial fathers who do carewho care deeplyand I believe that our justice system, not knowing in advance who they are, should operate in every case as though one's fatherhood matters to him, both for the sakes of all the individuals involved and for *519 the public's confidence that justice is being accomplished.

II.
I turn, now, to this case. Throughout the show cause hearing, counsel for the parties discussed E.P.'s opportunity interest, the related presumption in favor of a birth parent, and the evidence with respect to that presumption. In his final order, however, the magistrate judge did not mention E.P.'s opportunity interest in concluding that "there is clear and convincing evidence that [E.P.] is withholding his consent to the petition for adoption contrary to the best interest of the child." Later, the trial judge, in her review, noted that the magistrate judge "did not state that the father [had] failed to exercise his opportunity interest," but the trial judge added that the magistrate judge had "analyzed many facts toward that end." Then, after reviewing these facts, the trial judge concluded that "[c]learly these facts were sufficient for the [magistrate] judge to find that the father ... failed to grasp his opportunity interest." The trial judge concluded, having assumed that the magistrate judge "did not deal with the father's opportunity interest," that "the evidence and findings clearly support the waiver of consent."
In reviewing the trial judge's opinion, all members of this division agree that the judge "reached conclusions in the alternative: that (1) based on subsidiary facts found by the magistrate judge, E.P. had surrendered his opportunity interest, but that (2) even though the magistrate judge did not mention E.P.'s opportunity interest in the written findings of fact and conclusions of law, the record supplied clear and convincing evidence supporting the waiver."[3] As explained in the court's opinion, the division majority relied on the trial judge's second alternative, assuming that E.P.'s opportunity interest was intact, and then sustained the judge's ruling that, nonetheless, clear and convincing evidence supported the court's waiver of E.P.'s right to consent to the adoption followed by its order granting C.L.O.'s petition to adopt A.H.
Unwilling to proceed from the trial judge's second alternative, I turn to the opportunity interest on the merits. After reviewing the record, I am satisfied that the trial judge's first alternative is supported by the magistrate judge's findings. That is to say, the subsidiary facts found by the magistrate judge support an ultimate findinga conclusion of law[4]that E.P. failed to grasp his opportunity interest. Although the magistrate judgethe fact-finderdid not rule on E.P.'s opportunity interest, our standard of review, as indicated in the court's opinion, allows us, like the trial judge, to rule de novo on questions of law. And because the question of whether E.P. grasped his opportunity interest is a question of ultimate fact, meaning a question of law, we are empowered to answer that question by marshaling subsidiary facts found by the magistrate judge (to which we defer in the absence of clear error).[5]
*520 To date this court has announced five, non-exhaustive factors relevant to determining whether a noncustodial father has grasped his opportunity interest:
(1) the presence or absence of an established relationship between the child and an existing family; (2) whether the father has established a custodial, personal, or financial relationship with his child, or assumed responsibilities during the mother's pregnancy; (3) the impact, if any, of state action on the father's opportunity to establish a relationship with his child; (4) the age of the child when the action to terminate parental rights is initiated; and (5) the natural father's invocation or disregard of statutory safeguards designed to protect his opportunity interest.[[6]]
As to the first, fourth, and fifth factors, no one contests that A.H. has an "established relationship" with C.L.O. and her family or that A.H. was one year and three months old at the time the petition to terminate parental rights (TPR) was filed. Nor does the District of Columbia provide a statutory safeguard, such as a "putative father registry" that would permit a man anticipating fatherhood to register his interest in "assuming a responsible role in the future of his child" (thus ensuring that he receives prompt "notice of any action to terminate his parental rights").[7]
As indicated in the court's opinion,[8] E.P. cites the third factordeterminative on a different set of facts[9]claiming that government action (including inaction) interfered with his pursuit of his opportunity interest in developing a relationship with his daughter. He maintains, first, that the District of Columbia failed to act on the information available to find him after A.H. was born. He is wrong. The record reflects that the District made great effort, based on very little available information and with little cooperation from the natural mother, to locate the unknown father of A.H. And there can be no doubt that the District immediately notified E.P. of his right to participate in the pending judicial proceedings as soon as E.P. had been identified as a potential father.
E.P. then argues that the court's denial of his requests for unsupervised visits with his daughter and the court's denial of his request for an independent social worker impeded his ability to assert his custodial rights. These contentions, as applied to his claimed custodial preference, are unavailing for three reasons. First, on January 28, 2010, a CFSA investigator served E.P. with notice of the TPR proceeding, but it was not until several weeks later, in March, after learning of the DNA test results, that E.P. contacted CFSA and requested visits with A.H. By the time E.P. showed any interest in arranging visits with A.H., therefore, his opportunity interestlargely neglected over the seven-month period from August 2009 to March 2010had expired (as I shall explain in the paragraphs that follow). Second, CFSA social workers, sustained by the court, refused unsupervised visits because of E.P.'s conviction for attempted carnal *521 knowledge and, even more importantly, his failure to disclose it when asked about prior convictions.[10] Finally, the trial court is tasked with focusing on the best interest of the child, not on the parent's rights,[11] and the court concluded that there was no basis for finding that the CSFA social workers were inappropriately biased. There was, accordingly, no abuse of discretion by CFSA or the magistrate judge in declining E.P.'s requests.
The only open question, therefore, concerns the second factor: absent a custodial relationship (an uncontested finding), did E.P. grasp his opportunity interest "early on" by assuming responsibilities during K.H.'s pregnancy or, after the child's birth, by "continually [doing] all that he could reasonably have been expected to do under the circumstances to pursue that interest" by establishing a personal or financial relationship with A.H.?[12]
The magistrate judge found from E.P.'s testimony that he had had a "casual relationship" with K.H., including unprotected sex, "for a period of a few months" beginning in the winter of 2006-2007. A.H. was born on October 6 of 2007. E.P. testified that he was not aware that K.H. was pregnant while he was with her, and the magistrate judge did not find that he was aware. Rather, the magistrate judge found that E.P. had become aware of his likely fatherhood "sometime in the summer of 2009," when his cousin told him that K.H. had "had a child," that he "was the father," and that K.H. wanted E.P. "to take care of the child."
The magistrate judge made several findings relevant to E.P.'s pursuit of his opportunity interest from the time in 2009 that his cousin first told him about a child, namely: that (1) E.P. had "attempted on more than one occasion to find [K.H.] by going to the home of her family members and leaving messages" and had been "unsuccessful in finding her";[13] that (2) he "didn't see [K.H.] until she showed up at his home with a process server in January of 2010"; that (3) E.P. had "only provided financial support to one of his seven children"not A.H.; and that (4) after service of "notice of these proceedings in early 2010, and confirming paternity through DNA testing, Mr. [P.] arranged to begin visiting [A.H.] through the social workers of the Board of Child Care," beginning March 17, 2010, and "he has participated in regular weekly visits (which generally last one and one-half hours)" ever since. In this connection, the magistrate judge credited the social workers' testimony that E.P. had "interacted appropriately with [A.H.] during these visits." All of the magistrate judge's findings are supported by the record and in several instances are derived, without doubt, from uncontested testimony more specific than the finding itself.[14]
*522 I conclude that, as a matter of law, E.P. gave up his opportunity interest in obtaining permanent custody of A.H. because of his insufficient effort to find K.H. and "take care of the child" (as K.H. had requested through E.P.'s cousin) during the seven-month period between the time he learned that A.H. might be his child (August 2009) and his first contact with CFSA (March 2010) upon learning that DNA tests had proved that she was his child. Given this seven-month delay, I am satisfied that, from E.P.'s first awareness of likely fatherhood, he did notas this court has stressed a noncustodial father must "continually do all that he could reasonably have been expected to do under the circumstances" to pursue his opportunity interest by seeking "a custodial, personal, or financial relationship" with the child.[15]
More specifically, rather than instigate an energetic search and join his cousin in looking for K.H., after knowing there "might have been a possibility" that A.H. was his child, E.P. relied solely on his cousin and waited two weeks for her to report back. E.P. then made only three or four attempts over "a month or less" to find K.H. at her grandmother's house (which he acknowledged was only a five-minute drive from his home), apparently giving up easily on K.H.'s relatives. Nor did he seek out other alternatives. He did not contact CFSA, the agency most likely to be informed about a wandering, perhaps neglectful mother with a childreportedly histhat, according to his cousin, the mother wanted him "to take care of."[16] Nor, in case he was unaware of CFSA by name, did he go to the police for help in finding the government agency most likely to be aware of a neglected child. Finally, even after K.H. and the CFSA investigator confronted E.P. at his home on January 28, 2010, with service of formal notice of the TPR proceeding, E.P. did nothing to assert an interest in custody until he learned weeks later, in March, that he assuredly was A.H.'s father.[17] Especially *523 in the context of the strong public policy to achieve expeditious permanent custody once a child has entered foster care,[18] a noncustodial father will lose his opportunity interestthere will be no legitimate excuseif his effort to pursue his child is dilatory, as E.P.'s was.[19]
In sum, on this record, E.P.'s opportunity interest was forfeited.

III.
Because E.P. has failed to grasp his opportunity interest and lost his presumptive right to custody as a result, there remains the question whether the trial court, in deciding whether to waive E.P.'s required consent to the adoption of A.H., must find clear and convincing evidence that E.P.'s consent is "withheld contrary to the best interest of the child,"[20] as in the case of a fit, unwed, noncustodial father whose opportunity interest is assumed or grasped.[21] Or, given the fact that E.P. has forfeited the parental preference that accompanies that interest, does he revert to the status of a non-parent and thus open himself to a decision based on a mere preponderance of the evidence?[22]
As noted in the opinion for the court, we have never addressed this question.[23] *524 Nonetheless, we have noted that the law provides two methods for terminating parental rights: "a termination proceeding brought by the District or the child's legal representative under D.C.Code § 16-2353 (2001)," and "an adoption proceeding commenced by a private party, as a part of which a court may grant the adoption over the objection of a natural parent `when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interests of the child' under D.C.Code § 16-304(e) (2001)."[24] We added, moreover, that "the second method is the functional equivalent of the first," and that whether parental rights are relinquished in a termination or an adoption proceeding, "the court making the decision on what is in the child's best interest must be guided by the factors set forth in § 16-2353(b)" of the termination statute.[25] The termination statute provides that this determination must be made by clear and convincing evidence.[26]
Unlike the termination statute, however, the adoption statute does not contain an express burden of proof for imposing a court-ordered waiver of the parent's right to consent. I am satisfied, however, that just as the termination statute requires clear and convincing evidence to justify a termination of parental rights, a court-imposed waiver of a parent's consent to adoptioninherently terminating parental rightsmust satisfy that same burden of proof, without regard to whether the father's opportunity interest has remained intact while pursuing custody against the claim of a pre-adoptive foster parent. I see no reason why the fact that the termination issue arises in a contest between two individuals (father and pre-adoptive foster parent), rather than in a proceeding brought against the father alone by the District or the child's legal representative, should create any lesser burden on the pre-adoptive foster parent to justify taking the child from the natural father. If the situation generated two sequential proceedings, termination then adoption, the father's loss of his child could be justified only by clear and convincing evidence, followed by separate consideration of the adoption. The fact that the same ends are sought in one proceeding should not make any difference in the standard applicable to termination.
This conclusion flows from another perspective as well. In an adoption proceeding, the question whether the court should waive the father's required consent and grant the adoption is not merely a matter of comparing the father with the pre-adoptive foster parent; the court also has to make an independent judgment about that pre-adoptive parent under stringent statutory requirements focused on "the best interests of the prospective adoptee."[27] Thus, even if a court would find *525 the father a less reliable permanent custodian than a stranger (a preponderance determination, 51 percent to 49 percent)in part because the father had lost his opportunity interestthat finding in itself would not necessarily be saying that the child's best interest will be served by the proposed adoption. Although the adoption statute, unlike the termination statute, does not prescribe the quality of evidence necessary to justify an adoption, that statute nonetheless prescribes stringent criteria that must be satisfied before a favorable decree is entered, whether a natural parent is in the picture or not. It seems to me, therefore, that, especially when those criteria are added to the requirements of the termination statute, clear and convincing evidence is required to support the termination/adoption decision.
Finally, there is a constitutional underpinning to this discussion. In Santosky v. Kramer,[28] the Supreme Court opined that because natural parents have a "fundamental liberty interest ... in the care, custody, and management of their child," their parental rights may be terminated only by clear and convincing evidence, not merely by a fair preponderance of the evidence. A year after Santosky, however, in Lehr v. Robertson,[29] the Court intimated that a father who fails to grasp his opportunity interest may lose constitutionally mandated protections in an adoption proceeding. Nonetheless, even if Lehr casts doubt on whether the Constitution imposes Santosky's clear and convincing evidence standard in the adoption context when a father has failed to grasp his opportunity interest, our statutory law in the District of Columbia would not be affected. The District's adoption statute recognizes a residual liberty interest in a natural parent, including an unwed, noncustodial father without regard to his opportunity interest, by guaranteeing notice and a hearing when waiver of consent to adoption is at issue.[30] And nothing in Lehr undermines the statutory standard, as this court interprets it, for termination of a natural father's parental rights by court-ordered waiver of his consent in an adoption proceeding.

IV.
For all the foregoing reasons, therefore, I conclude that E.P. did not grasp his opportunity interest, and that the trial court did not abuse its discretion in ruling that clear and convincing evidence supported the court-ordered waiver of his consent to the adoption of his daughter, A.H., by the petitioner, C.L.O.[31]
NOTES
[1] This appeal comes from three trial court dockets for a neglect proceeding (NEG65-08), a proceeding to terminate parental rights (TPR65-08), and an adoption proceeding (ADA179-09). In the trial court, the neglect and adoption proceedings were consolidated, noting the TPR proceeding as a related case. E.P. filed one appeal referencing all three cases, lodged as two appeals on this court's docket (Nos. 11-FS-898 and 11-FS-727), reflecting the neglect and adoption proceedings, respectively. Both are now consolidated for disposition by this court. After the trial court granted the adoption, counsel for the District of Columbia represented that the TPR proceeding would be dismissed.
[2] Under District of Columbia law, D.C.Code § 16-2316.01(b)(1) (2001), the trial court must hold a fact-finding and dispositional hearing within forty-five days of the child's entry into foster care to determine whether the child has been neglected.
[3] See D.C.Code § 16-2323 (2005 Supp.).
[4] D.C.Code § 16-304(e) (2010 Supp.); see, e.g., In re J.G., 831 A.2d 992, 999 (D.C.2003) (upholding order waiving consent of natural parent and granting adoption).
[5] The record available on appeal does not disclose by whom.
[6] The adoption petition was subsequently consolidated with the neglect action. See supra note 1.
[7] E.P. testified at trial that he had had no idea where K.H. lived while he was seeing her, because she had always come to his house or he had picked her up from his cousin's house. He further testified that later, when his cousin approached him about the baby, he "had the idea that K. was staying with her grandmother because that'sD. [his cousin] took me to the grandmother's house. So I went to the grandmother['s] house with D." The grandmother lived near E.P.'s cousin, and E.P. described the grandmother's address at trial as "up the street" or about a five minute drive from his house.
[8] See D.C.Code § 16-304(e).
[9] For purposes of this opinion, references to the "trial judge's" or "trial court's" order are to Judge Carol A. Dalton's May 23, 2011 decision affirming the magistrate judge's final order of March 9, 2011.
[10] See Super. Ct. Gen. Fam. R. D(e).
[11] See Weiner v. Weiner, 605 A.2d 18, 20 (D.C. 1992).
[12] Id.
[13] See In re D.H., 917 A.2d 112, 117 (D.C. 2007).
[14] In re C.A.B., 4 A.3d 890, 902 (D.C.2010) (internal citation omitted).
[15] Weiner, 605 A.2d at 20.
[16] In re R.E.S., 19 A.3d 785, 789 (D.C.2011).
[17] In re D.H., 917 A.2d at 117.
[18] In re C.A.B., 4 A.3d at 899-900 (quoting In re S.M., 985 A.2d 413, 418 (D.C.2009)).
[19] Id. at 900 (quoting In re T.W.M., 964 A.2d 595, 601 (D.C.2009)).
[20] D.C.Code §§ 16-304(a), (b)(2)(A). The consent requirement does not apply when a parent, "after such notice as the court directs, cannot be located, or has abandoned the prospective adoptee and voluntarily failed to contribute to his support for a period of at least six months next preceding the date of the filing of the petition...." D.C.Code § 16-304(d).
[21] D.C.Code § 16-304(e).
[22] In re J.G., 831 A.2d at 999; accord In re J.D.W., 711 A.2d 826, 832 (D.C.1998) ("In the ordinary case where consent is withheld, the trial court must apply a clear and convincing evidence standard to determine whether a non-parent's adoption petition can be considered despite the biological parent's decision to deny consent.") (citing Santosky v. Kramer, 455 U.S. 745, 758, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (because natural parents have a "fundamental liberty interest ... in the care, custody, and management of their child," their parental rights may be terminated only by "clear and convincing" evidence, not merely by a "fair preponderance of the evidence")).
[23] D.C.Code § 16-2353(b) (2001).
[24] Id.; see also In re S.M., 985 A.2d at 416-17. The last three have no bearing on the facts of record:

(3A) the child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian, or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided....
D.C.Code § 16-2353(b).
[25] In re S.M., 985 A.2d at 417.
[26] Id.
[27] In the case law, the words "preference" and "presumption" are used interchangeably. See, e.g., In re S.M., 985 A.2d at 417.
[28] See Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Appeal of H.R., 581 A.2d 1141, 1162 (D.C.1990). Lehr cited the Fourteenth Amendment's due process clause because the case applied the U.S. Constitution to state law. In the present case, concerning District of Columbia law, the due process clause of the Fifth Amendment is at issue. See Bolling v. Sharpe, 347 U.S. 497, 498-99, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
[29] Appeal of H.R., 581 A.2d at 1162-63.
[30] In re S.M., 985 A.2d at 417 (quoting Appeal of H.R., 581 A.2d at 1143). The right to custody, therefore, is not assured even when the noncustodial father has grasped his opportunity interest and is entitled to the presumption. See In re Baby Boy C., 630 A.2d 670, 683 (D.C. 1993), cert. denied, 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994) (affirming adoption decree where, despite presumption favoring noncustodial father, trial court found by clear and convincing evidence that child would suffer significant psychological harm from removal from pre-adoptive home).
[31] Although, for purposes of our analysis, we need not resolve whether E.P. grasped his opportunity interest, we note that E.P., when focusing on one element of that inquiry, argues that government action (including inaction) interfered with pursuit of his opportunity interest. See Appeal of H.R., 581 A.2d at 1162 (listing impact of state action as a factor a court should consider in evaluating father's assertion of opportunity interest). He alleges that CFSA failed to act promptly on the information available to find him after A.H. was born, and that the trial court refused to grant his requests for unsupervised visitation with A.H. and for appointment of an independent social worker to counteract biases he perceived in the other social workers involved. E.P.'s argument here must fail. His claim that CFSA was derelict is belied by the record, and the trial court rulings, on this record, do not reflect an abuse of discretion.
[32] See supra note 23 and text following note 24. The trial judge, but not the magistrate judge, considered the natural mother's consent to the adoption as a relevant factor. This concern was not central to her ruling and is not a factor in ours.
[33] See Application of L.L., 653 A.2d 873, 884 (D.C.1995) (in weighing first TPR factor, trial judge entitled to consider evidence of party's ability to provide continuity of care, stability, and permanence); In re J.G., 831 A.2d at 1002 (same regarding evidence of child's full integration into stable pre-adoptive home).
[34] The record reflects that three of the four social workers did so.
[35] See, e.g., In re C.A.B., 4 A.3d at 902; see also In re Baby Boy C., 630 A.2d at 683.
[36] See, e.g., In re C.A.B., 4 A.3d at 902.
[37] The magistrate judge was particularly concerned about E.P.'s judgment in other ways he found relevant to E.P. as a parent:

Mr. [P.'s] relationship with [A.H.'s] mother reflects poor judgment. Mr. [P.] chose to engage in unprotected sexual relations on more than one occasion with someone who[ ] he believed had a drinking problem, and who[] social workers concluded had mental health problems and was not even able to provide adequately for her own hygiene or that of her child. Furthermore, the casual nature of the relationship is apparent in the fact that Mr. [P.] did not even know where the [child's] mother lived, or how to contact her, and yet he chose to engage in relations which obviously could have resulted, and in fact did result, in the unplanned pregnancy of a woman who was apparently poorly equipped to raise a child.
[38] Application of L.L., 653 A.2d at 882-83 (alteration omitted) (quoting Rock Creek Plaza-Woodner Ltd. v. District of Columbia, 466 A.2d 857, 859 (D.C.1983)).
[39] See id.
[40] See, e.g., In re F.W., 870 A.2d 82, 85 (D.C. 2005) (internal quotation marks omitted).
[41] In re C.A.B., 4 A.3d at 900 (quoting In re T.W.M., 964 A.2d at 601).
[1] See Lehr v. Robertson, 463 U.S. 248, 261-63, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Appeal of H.R., 581 A.2d 1141, 1161-63 (D.C. 1990) (Ferren, J., concurring).
[2] See Santosky v. Kramer, 455 U.S. 745, 758, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
[3] See, e.g., In re S.M., 985 A.2d 413, 417 (D.C.2009) ("The presumption must necessarily give way in the face of clear and convincing evidence that requires the court, in the best interest of the child, to deny custody to the natural parent in favor of an adoptive parent.").
[4] See D.C.Code § 16-2359(f) (2011 Supp.).
[1] See ante at 511-12 notes 28 & 29 and accompanying text.
[2] See In re S.M., 985 A.2d 413, 417 (D.C.2009) (holding remand required to allow trial court to apply best interests balancing test while honoring preference for fit parent where District of Columbia conceded trial court had clearly failed to consider whether presumptive parental preference applied); Appeal of H.R., 581 A.2d 1141, 1180-81 (D.C.1990) (holding remand necessary because trial court applied best interest standard without incorporating parental preference).
[3] Ante at 512.
[4] See Washington Chapter of Am. Inst. of Architects v. District of Columbia Dep't of Emp't Servs., 594 A.2d 83, 87 (D.C.1991) ("[T]he word `fact,' in this context, simply means that whether an employee leaves involuntarily or voluntarily ... is an `ultimate fact'a concept we have equated with a `conclusion of law.'") (quoting Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n, 402 A.2d 36, 42 (D.C.1979)).
[5] Although this court will review the trial court's finding of ultimate factits conclusion of lawde novo, this does not excuse the trial court from making that ultimate finding as to the opportunity interest. If the trial court were not to do so, there is considerable risk that that court would fail to find all the subsidiary facts necessary, in a case like this, to resolve whether a father had grasped his opportunity interest.
[6] Appeal of H.R., 581 A.2d at 1162.
[7] Id. at 1161.
[8] Ante at 512 n. 31.
[9] See Appeal of H.R., 581 A.2d at 1165 (Ferren, J., concurring) (concluding as matter of law that natural father, known to District officials responsible for adoption action, could not be said to have abandoned opportunity interest because District unlawfully failed to notify him of pending judicial proceedings).
[10] See In re Ko.W., 774 A.2d 296, 303 (D.C. 2001) (The "question whether a non-custodial parent should be granted visitation rights[ ] is committed to the sound discretion of the trial court; the exercise of that discretion is reviewable only for abuse.").
[11] In re A.C., 597 A.2d 920, 925 (D.C.1991) ("[T]he overriding consideration is the best interest of the child, which may compel the filing of a motion to terminate parental rights regardless of the defaults of public agencies in seeking reunification of the family.").
[12] Appeal of H.R., 581 A.2d at 1162-63.
[13] E.P. testified that he had visited the family home three to four times after waiting for two weeks for his cousin to find K.H. and report back to him.
[14] I interpret the magistrate judge's findings in light of the only testimony that could inform those findings. Preferably, the magistrate judge's findings would have been as specific as the testimony permitted, and I assume that they would have been had he focused on the particularity essential to assessing the father's grasp of his opportunity interest. I do not believe it is necessary, however, to remand for more particular findings because the magistrate judge's findings are supportable by more specific testimony in the record. See Jordan v. Jordan, 14 A.3d 1136, 1150 (D.C.2011) ("Where the record so plainly supports the conclusion that the required findings were actually (though implicitly) made, reversing and remanding the case for an explicit finding would be a waste of judicial resources and would elevate form over substance.").
[15] Appeal of H.R., 581 A.2d at 1161-63.
[16] E.P. testified that he was not aware that A.H. was in foster care until he received notice from the process server in January 2010. However, as noted in this court's opinion, ante at 514 n. 37, the magistrate judge made findings with regard to E.P.'s judgment, which suggested that E.P. was, or should have been, aware that his child might be neglected. The magistrate judge found:

Mr. [P.'s] relationship with [A.H.'s] mother reflects poor judgment. Mr. [P.] chose to engage in unprotected sexual relations on more than one occasion with someone who[] he believed had a drinking problem, and who[ ] social workers concluded had mental health problems and was not even able to provide adequately for her own hygiene or that of her child. Furthermore,. . . Mr. [P.] . . . chose to engage in relations which obviously could have resulted, and in fact did result, in the unplanned pregnancy of a woman who was apparently poorly equipped to raise a child.
[17] E.P. argues, contrary to the law governing opportunity interest, that his "first opportunity to assert his rights with respect to his daughter was the March 25 [2010] status hearing." He is incorrect. "[A] court evaluating a father's assertion of his opportunity interest is entitled to focus on the extent of the father's involvement as soon as he learns of the pregnancy." Appeal of H.R., 581 A.2d at 1162 (emphasis added). E.P. has acknowledged that he learned of the pregnancy and birth as early as August 2009, and I have explained how he should have begun to assert his custodial rights at that time.
[18] See D.C.Code § 16-2316.01 (2001).
[19] There may be avenues for pursuing an opportunity interest, such as the police or other government agency, that some fathers may be reluctant to try. I do not address whether such reluctance could ever be justified, for E.P. has not asked us to do so. But, if there could be a legitimate reason for ignoring a potential avenue for exploration, that would make all the more important the unrelenting pursuit of other avenues. On the facts here, it is clear that E.P. did not even come close to pressing K.H.'s family to find her and the child. Merely four visits over a "month or less" to the grandmother's house, where an uncle and aunt also resided or at least frequented, did not satisfy the requirement that he must have "early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue [his opportunity] interest" in developing a custodial relationship with his child. Appeal of H.R., 581 A.2d at 1162-63.
[20] D.C.Code § 16-304(e).
[21] See In re S.M., 985 A.2d at 417 (quoting Appeal of H.R., 581 A.2d at 1143) (right to presumptive custody "`can be overridden only by a showing by clear and convincing evidence that it is in the best interest of the child to be placed with unrelated persons'"); In re J.G., 831 A.2d 992, 999 (D.C.2003) (when biological parent withholds consent to proposed adoption, "the prospective adoptive parent must ordinarily show by clear and convincing evidence that consent is being withheld contrary to the child's best interest"); In re J.D.W., 711 A.2d 826, 832 (D.C. 1998) ("In the ordinary case where consent is withheld, the trial court must apply a clear and convincing evidence standard to determine whether a non-parent's adoption petition can be considered despite the biological parent's decision to deny consent."); ante at 17 n. 22 and accompanying text.
[22] When all parental rights have been extinguished and two non-parents, whether relatives or total strangers, petition to adopt a child, the court determines by a "preponderance of the evidence" which shall prevail. In re J.D.W., 711 A.2d at 830 (natural mother consented to adoption and natural father could not be located, meaning consent was not required pursuant to D.C.Code § 16-304(d)); Petition of D.I.S., 494 A.2d 1316, 1326 (D.C. 1985). This, of course, assumes that the contestants meet the statutory criteria for adoption under D.C.Code § 16-309(b) (2010 Supp.). In this connection, moreover, it is important to note that in the cases in which this court was faced with an adoption contest between two non-parents, termination of parental rights had already been achieved. See Petition of D.I.S., 494 A.2d at 1320 & n. 8 (mother had died and father had consented to adoption). Thus, the statutory requirement for terminating parental rights by "clear and convincing evidence" did not come into play.
[23] Ante at 512.
[24] In re S.M., 985 A.2d at 416.
[25] Id.
[26] D.C.Code § 16-2359(f) (2011 Supp.).
[27] D.C.Code § 16-309(b)(3). These requirements include the "suitability" of the child for adoption and the "fitness" of the petitioner to provide a "proper home and education." D.C.Code § 16-309(b)(1) and (2). The statute does not specify a standard of proof for determining "best interests," but it does build in protection against an ill-advised adoption by precluding a "final decree of adoption . . . unless the adoptee has been living with the petitioner for at least six months," D.C.Code § 16-309(c)(1), and by authorizing the court in any event, "in the interest of the prospective adoptee," to make the initial decree "interlocutory" for a period of six to twelve months before the adoption becomes "final." D.C.Code § 16-309(d).
[28] 455 U.S. at 753, 102 S.Ct. 1388.
[29] 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).
[30] D.C.Code § 16-304.
[31] I understand Judge Glickman to say that, because the trial court found clear and convincing evidence to support its waiver of E.P.'s consent to adoption, that ruling not only accorded E.P. the constitutional protection required for termination of his parental rights, but also implicitly recognized E.P.'s presumptive right to custody of A.H. Respectfully, I cannot agree.

A termination of the father's parental rights by clear and convincing evidence may satisfy the Constitution, but that does not resolve whether the father had grasped his opportunity interest, and thus obtained a custodial preference, before the court ruled. A father's presumptive right to custodya custodial preferenceis not necessarily inherent in, or established by, the "clear and convincing" standard of proof.
As Judge Glickman acknowledges in his concurring opinion, a determination as to whether a father has grasped or lost his opportunity interest is "factually relevant" to whether the court finds clear and convincing evidence to justify termination of his parental rights by waiving the father's consent to adoption. But a ruling that terminates parental rights after applying that standard of proof does notwithout express reference to the opportunity interestindicate whether the court has, or has not, premised its ruling on a custodial preference favoring the father.
I cannot quarrel with the legality of a trial court's expressly assuming a custodial preference for the father but concluding that clear and convincing evidence justifies a court-ordered waiver of the father's consent to adoption, in the child's best interest. For the reasons expressed in the foregoing opinion, however, I believe that such a course, in lieu of a considered ruling on the opportunity interest, is ill advised.
Indeed, under Judge Glickman's analysis as I understand it, the trial court can waive a father's consent to adoption by finding clear and convincing evidence that termination of his parental rights will be in the child's best interest, without even mentioning the father's opportunity interest. And that will be true whether the case concerns facts, such as heroic efforts by the father or culpable state action, that keep the opportunity interest alive, or facts reflecting dilatory efforts by the father that effectively surrender that interest. If the facts present a close case, perhaps trial judges will discuss as they shouldnot merely assumea father's custodial preference when terminating his parental rights. Even so, I do not find it appropriate to announce a rule that would permit the "assumption" shortcut in all cases when a father's parental rights are terminated, and especially not in the close cases.