*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FS-352

IN RE: PETITION OF J.J.;
T.R., APPELLANT

Appeal from the Superior Court
of the District of Columbia
(ADA-36-11)

(Hon. Errol R. Arthur, Trial Judge;
Hon. Jennifer A. Di Toro, Reviewing Judge)

(Argued December 2, 2014                    Decided March 26, 2015)

*Ronald A. Colbert* for appellant T.R.

*Gary P. Jacobs* filed a statement in lieu of a brief for appellant J.B., supporting appellant T.R.

*Anthony R. Davenport* for appellee J.J.

*Dennis Eshman* for appellee J.R.

*Aisha Lewis*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. Alikahn*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and REID, *Senior Judge*.

BLACKBURNE-RIGSBY, *Associate Judge*:  This case involves a challenge to a court-ordered waiver of parental consent to the adoption of child J.R by appellee-foster parent J.J., after a magistrate judge found that appellants, T.R. and J.B., the biological mother and father, had withheld their consent against the best interests of the child.  T.R. contends that there was insufficient evidence to support the magistrate judge's decision to waive her consent to adoption, and that the reviewing associate judge therefore abused her discretion by affirming.  J.B. joins without making additional claims. [1]  We discern no abuse of discretion and affirm.

## I.    FACTUAL BACKGROUND

J.R. was born on February 28, 2008, to mother T.R. and father J.B., but has lived continuously with her adoptive mother J.J., a licensed foster parent, since October 28, 2008.  J.R. came into J.J.'s care at approximately eight months old, after J.R. was committed to the custody of the District of Columbia upon allegations that T.R. failed to provide proper formula, used a sanitary napkin for a diaper, and engaged in an act of prostitution with J.R. present.  J.B. is not actively

---

[1]  J.B. did not file a notice of appeal from the trial court's order, and presumably waived his right to do so, but he nonetheless filed a statement in lieu of a brief through court-appointed counsel.  We consider J.B.'s statement supporting T.R.'s appeal in equity.  *See* D.C. Code § 11-721 (2012 Repl.).

involved in J.R.'s life, but has provided occasional financial support and visited J.R. several times before and after his incarceration for second degree assault from June 2011 through October 2012.

At J.R.'s adoption hearing, three social workers who have worked with J.R. testified in support of J.J.'s adoption petition. Dr. Seth King, a psychologist qualified as an expert witness, also testified in favor of J.J.'s adoption petition after individually evaluating T.R. and J.J. and observing their interactions with J.R. The magistrate judge presiding over the hearing concluded that J.J. had established by clear and convincing evidence that T.R. and J.B. had withheld their consent to adoption against J.R.'s best interests,[2] and granted J.J.'s petition for adoption on May 8, 2013. A final decree of adoption followed.

T.R. and J.B. filed motions for review of the magistrate judge's order in the trial court, pursuant to D.C. Fam. Ct. R. D (e)(1). Specifically, T.R. alleged that the magistrate judge granted J.J.'s adoption petition without making sufficient factual findings, pursuant to D.C. Code § 16-2353 (b) (2012 Repl.), to establish by

---

[2] *See* D.C. Code § 16-304 (e) (2012 Repl.) ("The court may grant a petition for adoption without any of the consents specified in this section, when the court finds, after a hearing, that the consent or consents are withheld contrary to the best interest of the child.").

clear and convincing evidence that: (i) T.R. withheld her consent to J.R.'s adoption contrary to J.R.'s best interests, (ii) T.R. suffers from physical, mental, or emotional impairments that prevent her from parenting, or (iii) J.R. has an opinion regarding her custodian. Additionally, J.B. alleged that the magistrate judge granted J.J.'s adoption petition without first finding that he was unfit or adequately considering his request to place J.R. with him, thereby depriving him of his constitutional right to maintain a relationship with J.R.[3]

On review, the associate judge concluded that the magistrate judge did not abuse his discretion in finding clear and convincing evidence to waive T.R.'s consent to adoption, pursuant to D.C. Code § 16-304 (e) (2012 Repl.).[4] In reaching this conclusion, the associate judge noted the following findings of the magistrate judge: J.R. has lived with J.J. for most of her life, and that J.J. provides "excellent care" and a stable environment in a "clean and 'kid-friendly'" two-level home, where J.R. is an integrated part of J.J.'s family. J.J. meets J.R.'s educational and medical needs, including administering epilepsy medication, takes J.R. to dance and music lessons, and makes an effort to facilitate interaction with T.R. and J.B.

---

[3] J.B. did not renew these claims on appeal to this court. See *supra* note 1.

[4] See *supra* note 2.

Dr. King testified that J.R. was accustomed to the stability of J.J.'s care, and social worker Kimberly Beard testified that J.R. needed the permanency of living with J.J. J.J. has maintained J.R.'s physical, mental, and emotional health, and properly responded to an incident in which J.R. sustained a serious burn injury in T.R.'s care by taking J.R. to the hospital for treatment, whereas T.R. did not do so.[5]

On the other hand, the associate judge noted that T.R.'s relationship with J.R. is less developed and her visits with J.R. have been inconsistent.[6] Dr. King individually assessed J.J. and T.R., and their respective relationships with J.R., and opined that T.R. did not demonstrate insight into the need to comply with mental health treatment, in spite of her history of mental health treatment and therapy and

---

[5] According to J.J.'s testimony regarding this incident, in July 2010, J.R. received serious burns to her upper and lower arm while on an unsupervised visit with T.R. When J.J. arrived to pick up J.R., T.R. told J.J. that the burns were "sunburn." T.R. did not take J.R. to the hospital for treatment. J.J. did not think that the burns looked like sunburn because J.R.'s skin was loose and blackened, so J.J. took J.R. to the emergency room where the burns were cleaned and J.R. received pain medication. The burns healed within four to five weeks. The court considered this event in its decision to order supervised visitation and, on October 27, 2010, to revise J.R.'s permanency goal from "reunification" to "adoption."

[6] Two social workers testified at the adoption hearing that T.R. visited J.R. consistently until February 2012, then visited only three times between February 2012 and October 2012, after failing to show up for eight visits. From October 2012 through the date of testimony, T.R. attended six visits out of eleven visits offered, citing sickness and not wanting to take her other children out in bad weather.

her ongoing "emotional distress and impulse control problems." Dr. King observed that T.R. seemed to focus on her own needs when interacting with J.R. and that J.R. did not readily comply with T.R.'s instructions and demonstrated a less secure attachment with T.R., even asking for "mommy" during their interaction. On the other hand, Dr. King concluded that J.J. demonstrated emotional stability and an ability to be a positive role model. J.R. regards J.J. as her "mother figure," and their interaction was natural and "bi-directional." After reviewing these findings of the magistrate judge, the associate judge inferred J.R.'s preference to remain with J.J., and concluded that T.R. suffers from various "physical, emotional, and mental health impairments that would prevent her from parenting [J.R.]."

The associate judge also reviewed the magistrate judge's findings related to J.B. Prior to J.B.'s incarceration in June 2011, his visits with J.R. were limited, and he made no effort to contact J.R. during his incarceration. After his release in October 2012, J.B. waited for two months to visit J.R., and did so only twice before the adoption hearing, although eleven visits were offered. Other than visitation, J.B. has made minimal effort to contact J.R. As a result, J.B's relationship with J.R. is "less well-developed" than J.J.'s relationship with J.R. Further, J.B. has provided little financial support and has never attempted to

become familiar with addressing J.R.'s epilepsy. Accordingly, the associate judge concluded that the magistrate judge did not abuse his discretion in determining, based on clear and convincing evidence, that J.B. waived his consent to J.R.'s adoption. The associate judge further concluded that J.B. had "failed to grasp his opportunity interest"[7] after his incarceration and that the magistrate judge was not required to make an explicit finding that J.B. was "unfit" in order to waive his consent to adoption. *See In re C.L.O., supra* note 7, 41 A.3d at 512; *In re J.C.F.*, 73 A.3d 1007, 1015 n.4 (D.C. 2013) (affirming waiver of biological father's consent "even though the magistrate judge did not mention [the father's] opportunity interest in the written findings of fact and conclusions of law [because] the record supplied clear and convincing evidence supporting the waiver"). On this same basis, the associate judge concluded that the magistrate judge did not need to make a finding with regard to J.B.'s request that J.R. be placed with him, and determined that J.R.'s best interests lay with J.J. rather than her father, "with whom she had never lived and whose contact was limited." This appeal followed.

---

[7] *See In re C.L.O.*, 41 A.3d 502, 511-12 (D.C. 2012) (internal citations and quotation marks omitted) ("The court will invoke the presumption or preference in favor of a fit, unwed, noncustodial father only when the court finds that he timely grasped his constitutional "liberty" interest — now commonly called his 'opportunity interest' — protected by due process. That is to say, the father must have early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue that interest in developing a custodial relationship with his child.").

## II.    ANALYSIS

### A. *Standard of Review*

Procedurally, our role is to review the ruling of the associate judge, in which it reviewed the magistrate judge's order for errors of law, abuse of discretion, and clear lack of evidentiary support. *In re C.L.O., supra* note 7, 41 A.3d at 510 (citation omitted). Nonetheless, we are not limited to the associate judge's ruling and may review the trial court as a whole, "look[ing] to the findings and conclusions of the fact finder on which that ruling is based." *Id.* at 510 (citation omitted). Thus, in reviewing the trial court's determination, we apply the same standard of review that the associate judge applied to the magistrate judge's order and may "review the magistrate judge's factual findings as the findings of the trial judge . . . for abuse of discretion or a clear lack of evidentiary support." *Id.* (citations and internal quotation marks omitted).[8] Our review of legal conclusions, however, is *de novo*. *Id.* (citations omitted).

---

[8] *See* D.C. Fam. Ct. R. D (e)(5) ("The standard of review by the associate judge of a magistrate judge's final order or judgment shall be the same as applied by the Court of Appeals on appeal of a judgment or order of an associate judge of the Superior Court. In accordance with this standard a magistrate judge's finding of fact may not be set aside unless clearly erroneous; nor may the magistrate

(continued . . .)

"The determination whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion." *In re J.G.*, 831 A.2d 992, 999 (D.C. 2003) (citation omitted). In our review, we determine whether the trial court exercised that discretion "within the range of permissible alternatives, based on all relevant factors and no improper factor," and supported its decision with "substantial reasoning drawn from a firm factual foundation in the record." *In re S.L.G. & S.E.G.*, No. 14-FS-73, slip op. at 16 (D.C. March 5, 2015) (citations omitted).

### B. Applicable Law

Generally, a trial court may not grant an adoption petition without the consent of both biological parents. *See* D.C. Code § 16-304 (a)–(b) (2012 Repl.); *In re C.L.O., supra* note 7, 41 A.3d at 510. Yet the trial court, in its discretion, may grant an adoption petition without parental consent if, after a hearing, the prospective adoptive parent meets the burden of showing by clear and convincing evidence that the biological parents withheld their consent "contrary to the best interest of the child." § 16-304 (e); *see In re C.L.O., supra* note 7, 41 A.3d at 510-

---

(. . . continued)
judge's final order or judgment be set aside except for legal error or abuse of discretion.").

11 (citation omitted). In making a "best interests" determination, the trial court applies the same statutory factors that apply in a proceeding to terminate parental rights, as outlined in D.C. Code § 16-2353 (b) (2012 Repl.). *See In re D.H.*, 917 A.2d 112, 117 (D.C. 2007). Section 16-2353 (b) provides:

> (b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
>
> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
>
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter . . .[9]

D.C. Code § 16-2353 (b) (2012 Repl.).

---

[9] Two additional factors, D.C. Code § 16-2353 (b)(3A) and (5), relate to hospital abandonment and drug activity, respectively, and are not at issue here.

A trial court must apply these statutory factors with full appreciation of the gravity of terminating parental rights, beginning with "the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit." *In re C.L.O., supra* note 7, 41 A.3d at 510 (citation omitted). This strong presumption "reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children." *See In re S.L.G. & S.E.G., supra*, No. 14-FS-73, slip op. at 19. The presumption may be rebutted "only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest." *Id.* at 20 (quoting *In re Rashawn H.*, 937 A.2d 177, 190 (Md. 2007)). Accordingly, in *In re S.L.G. & S.E.G.* we held that it is incumbent on the trial court to make "express, specific, and well-reasoned findings," based on the statutory factors, as to whether the presumption has been rebutted, and that only through such findings does a court strike the "proper and harmonious balance" between parental rights and the statutory basis for terminating these rights. *Id.* at 25-26 (quoting *In re Rashawn H., supra*, 937 A.2d at 192).

When the trial court's findings are deficient in this regard, this court may determine that remand is appropriate. *Id.* at 27-28. (concluding that remand was

appropriate because "the findings and conclusions of the trial court are incomplete: For all the detailed and well-supported factual findings . . . the trial court decisions fail to acknowledge the presumption in favor of a fit natural parent and explain why that presumption either is inapplicable in this case or is overcome by clear and convincing evidence of what [the child's] welfare requires despite parental fitness"). Yet the trial court may satisfy its responsibility, and thereby avoid remand, without making an explicit "fitness" finding if it makes "equivalent findings," based on the evidence in the record, demonstrating that the parent "lacks the capacity or motivation to meet the child's needs or protect the child from harm." *Id.* at 27.

## *C. Discussion*

Preliminarily, we note that the magistrate judge did not make an explicit finding that T.R. and J.B. were "unfit" to parent J.R. Even so, this does not necessitate a remand where the trial court made "equivalent findings" for each parent, based on the evidence in the record. *See In re S.L.G. & S.E.G., supra*, No. 14-FS-73, slip op. at 27. Our scope of review encompasses the findings and conclusions of the trial court, including the magistrate judge in the first instance and the reviewing associate judge, and we conclude that "equivalent findings" are

readily apparent here.  *See id.* at 16-17, 27  (quoting *In re C.L.O., supra* note 7, 41 A.3d at 510).  In contrast to *In re S.L.G. & S.E.G.*, here, the reviewing associate judge relied upon the magistrate judge's comprehensive findings of fact to determined that T.R. suffers from various "physical, emotional, and mental health impairments that would prevent her from parenting [J.R.]," and that the parental presumption in favor of J.B. was rebutted by his "fail[ure] to grasp his opportunity interest upon his release from incarceration."  *See In re S.L.G. & S.E.G., supra*, No. 14-FS-73, slip op. at 28.  These "equivalent findings" rebut the presumption in favor of placing J.R. with her natural parents, *see id.* at 20 (quoting *In re Rashawn H.*, 937 A.2d 177, 190 (Md. 2007)).  We now turn to T.R.'s arguments on appeal and the trial court's conclusions with regard to each factor outlined in § 16-2353 (b) to determine whether T.R. waived her consent to adoption against J.R.'s "best interest."

1. ***The child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages***

T.R. broadly claims that the trial court erred by making a direct comparison of her abilities and means with those of J.J.  *See In re A.W.K., supra*, 778 A.2d at 326 (citation omitted).  T.R. contends the facts in the record demonstrate her

ability to provide a stable home for J.R., and that because she is J.R.'s biological mother, our review should weigh this fact heavily. She explains that she has a room, clothes, and toys for J.R. in the apartment that she shares with her fiancé and their two children. She explains that the burn J.R. suffered in her care was "a wake up call for being a parent," and that she is a better parent because of it. If J.R. were entrusted to her care, she contends that she has a transition plan that includes a period of contact with J.J. J.R. also states that she serves as the "neighborhood mother" to the children in her apartment complex and reports that she has completed court-ordered parenting classes.

The trial court's role in making a determination of whether to terminate parental rights is not to inquire "whether the adoption petitioners would be better parents, or would provide a better home[,]" but rather, whether the drastic measure of terminating rights "is necessary in order to protect the best interests of the child." *In re J.L., supra*, 884 A.2d at 1077 (citation omitted). The trial court did not misunderstand this role. In weighing this factor in favor of adoption, the trial court determined that T.R. has made many questionable parenting decisions during supervised and unsupervised visits with J.R. We also note that T.R. testified at the adoption hearing about her involvement in incidents of domestic violence and stated that she was unemployed at the time of the hearing, after quitting two jobs.

T.R.'s efforts to better herself and to learn from her mistakes are commendable, but do not overcome the evidence undermining her ability to provide a stable home environment. That J.J.'s stable employment and home environment draw a glaring contrast is not the result of erroneous analysis or direct comparison. J.J. has provided continuous care for all but eight months of J.R.'s seven-year life, and Dr. King testified that removing J.R. from this environment could be "potentially devastating." *See In re J.L., supra*, 884 A.2d at 1078 (weighing a child's need for a stable and permanent home in favor of adoption where children had lived with a stable caretaker for four years and the biological parent was "unable to offer such an environment either at this time or in the near future"). The trial court did not abuse its discretion in concluding that clear and convincing evidence in support of this statutory factor weighs in favor of waiving parental consent to adoption.

> 2. ***The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child***

T.R. argues that this factor should weigh in her favor for multiple reasons. First, she has raised two additional children since J.R., neither of whom was removed from her care, in spite of an investigation request submitted by one of J.R.'s social workers. Second, she has grown as a parent because of J.R.'s burn

incident. Third, she explains that her visits with J.R. have been limited because she uses public transit to get to work and the agency has not accommodated her request for weekend visits. Fourth, she argues that she no longer needs therapy and that there is no indication that living without therapy has impacted her ability to parent J.R. or her other children.

The trial court considered the health of all individuals involved in weighing this factor in favor of adoption, and did not abuse its discretion in concluding that T.R.'s impairments "prevent her from parenting T.R." In particular, T.R. has a history of personal trauma and mental health treatment, has made several questionable parenting choices, and refused to engage in individual or joint therapy with J.R. In Dr. King's individual evaluation, T.R. mentioned trauma in her past and symptoms throughout her life, but did not see any need for additional therapy, nor did she seem to have insight into the need to be compliant with treatment. On the other hand, Dr. King's evaluation of J.J. showed that she is emotionally stable and a role model, in whose care J.R. has flourished, through J.J.'s active participation in J.R.'s education, medical care, and activities such as dance and music classes. *See In re Petition of W.D.*, 988 A.2d 456, 461-62 (D.C. 2010) (weighing the second statutory factor in favor of an adoption petitioner who had a strong bond with the child and provided for medical and educational needs, over a

mother who failed to avail herself of "recommended services, including therapy"). Importantly, J.J. also took an active role when J.R. was burned in T.R.'s care, whereas T.R. did not.

The "decisive consideration" for this statutory factor is J.R.'s physical, mental, and emotional needs. Particularly relevant to this consideration is Dr. King's conclusion that removing J.R. from J.J.'s care would be "potentially devastating" and could impact J.R.'s development. It is concerning, then, that T.R. agrees that therapy between J.R. and J.J. would be helpful to ease a transition, but that she would not participate in similar therapy with J.R. Bearing this consideration in mind, and weighing heavily the trial court's conclusion that T.R.'s impairments "would prevent her from parenting "[J.R.]," we discern no abuse of discretion in the trial courts determination to weigh this statutory factor in favor of waiving parental consent to adoption.

3. *The quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent*

In challenging the trial court's determination on this factor, T.R. explains that her work schedule interfered with her ability to visit J.R., that the foster

agency was unwilling to provide weekend visits, and that she was forced into the quandary of providing for her other children or visiting with J.R.

While we are cognizant of the impact that public transportation, work schedule, and other parenting duties have had on T.R.'s missed visitation, we see no abuse of discretion in the weight that the trial court accorded this statutory factor. Visitation is T.R.'s primary opportunity to interact with and develop a relationship with J.R., and T.R.'s visits became quite sporadic after February 2012. Moreover, after Dr. King evaluated T.R.'s interaction with J.R., he determined that J.R. does not respond to T.R. as a primary caregiver and that T.R. seemed to focus on her own needs when interacting with J.R. J.J., on the other hand, has served as J.R.'s primary caregiver for most of J.R.'s life, and Dr. King's evaluation led him to conclude that J.R. regards J.J. as her "psychological parent" and "mother figure" and calls her "mommy." Their interaction is natural and bidirectional. Further, J.R. is close to J.J.'s family and refers to them by family names. *See In re Petition of W.D., supra,* 988 A.2d at 463 (concluding that "extensive evidence of [the child's] bond with the [adoptive parent] and [the child's] limited interaction with her mother supports the trial court's determination" to weigh the third statutory factor in favor of adoption). Given these findings, the trial court did not abuse its

discretion in finding clear and convincing evidence that this statutory factor should weigh in favor of waiving parental consent to adoption.

### 4. To the extent feasible, the child's opinion of his or her own best interests in the matter

T.R. merely argues that this factor "cannot be properly weighed" because of J.R.'s age and because J.R. refers to both T.R. and J.J. as "mommy."

A trial court is not required to elicit a child's opinion regarding her own best interests from direct testimony, and the absence of such direct testimony does not prevent the trial court from determining the child's preference. *See In re T.W.M.*, 18 A.3d 815, 822 (D.C. 2011) (ruling that a court has no duty to rely on direct testimony and that "in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior . . ."). J.R. was four years old at the time of the adoption hearing, and the magistrate judge inferred her preference to remain with J.J. from witness testimony regarding their level of comfort and familiarity. Dr. King's interaction evaluations and the testimony of J.R.'s social workers indicate that J.R. has a strong bond with J.J. that is not present with T.R. Therefore, evidence that J.R. has referred to T.R. and J.J. as "mommy" is not dispositive and,

in any event, the record also indicates that J.R. has asked for "mommy" in the presence of T.R. On these facts, the trial court did not abuse its discretion in weighing the clear and convincing evidence of J.R.'s behavior in favor of waiving parental consent to adoption.

## III. CONCLUSION

While the magistrate judge did not make an express finding of parental unfitness to rebut the presumption in favor of placing J.R. with her natural parents, we do not discern any deficiency necessitating a remand under our holding in *In re S.L.G. & S.E.G., supra*, No. 14-FS-73, slip op. at 20. In so holding, we emphasize that the magistrate judge's comprehensive factual findings, and the associate judge's thorough review of those findings and her conclusions with regard to parental fitness, place this case in a different posture than *In re S.L.G. & S.E.G.* Here, the trial court's detailed factual findings and determination that T.R.'s impairments prevented her from parenting J.R. constitute "equivalent findings" of unfitness, as contemplated by the court in *In re S.L.G. & S.E.G.*, to rebut the parental presumption and avoid remand. *See id.* at 27. Nor do we discern any abuse of discretion in the trial court's determination to waive parental consent to adoption. Accordingly, the petition on appeal is hereby affirmed.

*So ordered.*