# District of Columbia
# Court of Appeals

No. 14-FS-1310

IN RE: PETITION OF G.A.P.;
    R.S.,

                    Appellant.

ADA-200-13

On Appeal from the Superior Court
of the District of Columbia

BEFORE: BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*; and FERREN, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 17, 2016.

Opinion by Senior Judge John M. Ferren.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 14-FS-1310

FILED 3/17/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

IN RE PETITION OF G.A.P.;

R.S., APPELLANT.

Appeal from the Superior Court of the
District of Columbia
(ADA-200-13)

(Hon. Janet Albert, Magistrate Judge)
(Hon. Hiram E. Puig-Lugo, Reviewing Judge)

(Argued January 13, 2016                    Decided March 17, 2016)

*Lisa Orlow* for appellant.

*Joseph L. Meadows*, with whom *Daniel Forman* and *Jonathan M. Krell*, were on the brief, for appellees G.A.P. and Guardian Ad Litem.

*Karl A. Racine*, Attorney General for the District of Columbia, with whom *Todd S. Kim*, Solicitor General, *Loren L. Alikhan*, Deputy Solicitor General, and *Jennifer V. Hancock*, Assistant Attorney General Office of the Solicitor General, for the District of Columbia, filed a statement in lieu of brief.

Before BLACKBURNE-RIGSBY and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*: Following a bench trial, the magistrate judge found the minor child, J.P., suitable for adoption by appellee, G.A.P., after waiving the required consent of J.P.'s biological parents. An associate judge reviewed the

magistrate judge's order for "errors of law, abuse of discretion, or clear lack of evidentiary support" and affirmed.[1]  Appellant R.S., J.P.'s biological mother, appeals the order terminating her parental rights and granting G.A.P.'s adoption of J.P.  For the reasons set forth below, we affirm.

**I.**

In January 2011, when J.P. was only a few months old, R.S. left him in the care of an acquaintance.  While there, J.P. suffered severe burns to his posterior upper extremities, back, and gluteal regions.  J.P. was airlifted to Shriners Hospital for Children in Boston to receive intensive treatment.  Immediately after returning from Shriners, J.P. was placed in foster care by the Child and Family Services Agency (CFSA), and the District of Columbia filed a petition alleging that J.P. was a neglected child.  On March 17, 2011, R.S. stipulated that she had not provided J.P. with proper care.  The court found J.P. to be a neglected child pursuant to D.C. Code § 16-2301(9)(A)(ii) (2012 Repl.).

---

[1] *In re C.L.O.*, 41 A.3d 502, 510 (D.C. 2012).  In this court's review of a trial court order reviewing a magistrate judge's ruling, we interchangeably refer to the Superior Court judge who reviews the magistrate judge as the "reviewing judge," the "associate judge," or the "trial judge" (or "trial court").

At a disposition hearing on March 31, 2011, the court set the goal of reunification of J.P. with R.S., and CFSA offered services to R.S. to achieve that end. R.S. has been diagnosed with bipolar disorder for which she requires medication. She also has a history of domestic violence with both her prior husband (J.P.'s father) and her current husband. In addition, R.S. has been diagnosed with cannabis dependence. At a review of the disposition order on July 7, 2011, the court ordered R.S. to continue to take her medication, attend domestic violence counseling, and follow through with individual therapy.

At a permanency hearing held on March 28, 2012, the court changed the goal from reunification to guardianship because R.S. had not made sufficient progress in therapy, substance abuse treatment, and domestic violence counseling. Of particular note, R.S. had "fail[ed] to take medication consistently or participate in therapy" for her bipolar disorder, asserting that she did not have an illness. The court had also ordered R.S. to participate in weekly drug testing, which she failed to attend on 26 occasions. R.S. had also tested positive for marijuana at least 18 times, and on four occasions R.S. attempted to conceal her drug use through "water loading."

In August 2013, CFSA placed J.P. in foster care with appellee, G.A.P., who filed for adoption on October 15, 2013. On November 12, 2013, seeking to update her 2012 psychological assessment, R.S. filed "Mother's Ex Parte Motion For An Independent Evaluation to Assess Mother's Parenting Ability." A magistrate judge denied the motion in chambers on January 31, 2014, because a motion for relief *ex parte* was "inappropriate." R.S. renewed the motion on February 18, 2014, and served all parties two days later. It was denied on the merits, without explanation, on February 26, 2014.

In the meantime, on November 18, 2013, the magistrate judge had changed the permanency goal from guardianship to adoption over the objection of R.S. The trial on G.A.P.'s petition to adopt J.P. took place intermittently the following spring from early March to late May of 2014. In her opinion of June 30, 2014, the magistrate judge found clear and convincing evidence that R.S. was withholding consent to the adoption contrary to J.P.'s best interests and accordingly ruled that "the consent of the biological parents will be waived."[2] The judge based her conclusion on findings that R.S. could not provide a stable home because of her

---

[2] The magistrate judge waived the consent of J.P.'s father, S.S., based on her finding of "clear and convincing evidence that [S.S.] abandoned [J.P.] and voluntarily failed to contribute to his support" for the six months preceding the date of the filing of the adoption petition. S.S. filed a statement in lieu of a brief in which he chose to make no representations regarding this appeal.

failure to refrain from substance abuse, the presence of domestic violence, her untreated mental illness, and her failure to engage with support services provided by CFSA. The judge then concluded that J.P. was "clearly fit to be adopted," that adoption was "in the best interest of" J.P., and that G.A.P. was "a suitable caretaker." On October 24, 2014, the reviewing judge affirmed the judgment "grant[ing] [G.A.P.'s] petition for adoption."

## II.

R.S. raises three issues on appeal. *First*, she argues that the trial court, in waiving her consent to the adoption, did not consider the "parental presumption" of fitness in her favor. *Second*, she challenges the trial court's decision to deny her request for an updated, independent mental health evaluation. *Third*, she argues that her use of marijuana, which to some extent has been legalized in the District of Columbia, is not "drug related activity" within the meaning of D.C. Code § 16-2353(b)(v) and, therefore, should not have been considered a factor in determining whether her parental rights should be terminated and her consent to adoption waived. (R.S. did not question G.A.P.'s fitness to adopt J.P.)

## III.

"The determination of whether a birth parent's consent to the adoption of a child has been withheld contrary to the child's best interest is confided to the trial court's sound discretion."[3] After a magistrate judge issues findings, conclusions, and a final decree of adoption, an associate judge reviews them, if appealed.[4] If the associate judge affirms the decree, this court will take the approved findings as findings of the trial court and review them for "abuse of discretion or a clear lack of evidentiary support," while claimed errors of law are reviewed *de novo*.[5]

## IV.

As a general rule, a court may not grant a petition for adoption without the written consent of the child's living, natural parents.[6] However, the trial court may

---

[3] *In re C.LO.*, 41 A.3d at 510 (citing *In re D.H.*, 917 A.2d 112, 117 (D.C. 2007).

[4] *Id.*

[5] *Id.*; *accord In re J.J.*, 111 A.3d 1038, 1043 (D.C. 2015).

[6] D.C. Code §§ 16-304 (a), (b)(2)(A); *In re C.L.O.*, 41 A.3d at 510.

waive this requirement upon a finding, based on clear and convincing evidence, that a parent has withheld consent contrary to the best interest of the child.[7] The best interest analysis applies the same factors used in proceedings to terminate parental rights (TPR) pursuant to D.C. Code § 16-2353(b):[8]

> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent;
>
> (4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
>
> (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided. . . . Evidence of continued drug-activity shall be given great weight.

---

[7] *Id.* at 510-11.

[8] *In re P.S.*, 797 A.2d 1219, 1223 (D.C. 2001).

In applying these TPR factors, the trial court should "begin[] by recognizing 'the presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit.'"[9] This presumption — that the natural parent, presumably fit, should be the child's lawful custodian — will then be confirmed or rebutted by the court's consideration of "the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs[,][10] . . . in a way that does not endanger the child's welfare."[11] In our recent decision in *S.L.G.*, we instructed the trial court, when applying this parental presumption, to test its viability by "determin[ing] *expressly* whether [the court's] findings [based on each relevant factor] suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child[,] or to

---

[9] *In re C.L.O.*, 41 A.3d at 511 (quoting *In re S.M.*, 985 A.2d 413, 417 (D.C. 2009)).

[10] *In re S.L.G.*, 110 A.3d 1275, 1287 (D.C. 2015).

[11] *Id.* (quoting *In re Adoption/Guardianship of Rashawn H.*, 937 A.2d 177, 191 (Md. 2007)). In *S.L.G.*, we observed: "The same statutory factors that guide the court's determination of a child's best interest in a TPR or contested adoption proceeding, therefore, also guide the court's assessment in that proceeding of the natural parent's fitness *vel non*." We also stressed, however, that parental "fitness" is not merely a restatement of the "best interests of the child," as determined by a TPR or contested adoption proceeding. "Fitness," rather, is an independent determination of parental "intention and ability over time," guided not only by application of the TPR factors but also by additional considerations, as needed (with examples given) to resolve the natural parent's capacity to "care for the child" and protect the child against "undue risk of harm." *Id.*

constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child,"[12] even though the parent, as a general matter, could not be found unfit. Moreover, we stressed that the trial court will not fulfill this responsibility for explicitness through mere "verbal allowance that the presumption exists," followed by cursory recitation of evidence relevant to each factor coupled with "a conclusory, 'totality-of-the-circumstances' determination" purporting to justify the trial court's waiver of parental consent.[13] In sum, the trial court "must correctly and explicitly 'incorporate the parental presumption into its analysis.'"[14]

After saying all that, however, we acknowledged in *S.L.G.* that "a mere failure to use the particular terminology of 'fitness'" is not necessarily "fatal by itself."[15] We acknowledged that the "omission of an explicit statement that a

---

[12] *Id.* at 1289 (quoting *In re Adoption/Guardianship of Rashawn H.*, 937 A.2d at 192) (emphasis added). In a brief concurring opinion, Senior Judge Newman wrote: "While I join the court's opinion, I write separately to state that my fertile imagination is not able to postulate a realistic factual situation where a 'fit' parent can be properly deprived of parental rights based on the 'best interest of the child.' However, on the premise that virtually anything is 'possible,' I join."

[13] *Id.*

[14] *Id.* (quoting *In re D.S.*, 88 A.3d 678, 697 (D.C. 2012)).

[15] *Id.*

natural parent is 'unfit' may be of no moment if there are *equivalent findings*, supported by the evidence, that the parent lacks the capacity or motivation to meet the child's needs or protect the child from harm."[16]  In the present case, apparently recognizing that the trial court did not explicitly employ "fitness" terminology, appellee G.A.P. stresses that the trial court relied on "equivalent findings" that satisfy the explicitness requirement.  R.S., however, has not challenged the trial court's waiver of her consent to adoption on the ground that the court's findings lack the required equivalency.  Nonetheless, she squarely challenges the termination of her parental rights through a court-ordered waiver of her statutory right to consent to adoption of J.P.  And, she has questioned certain findings to a point that we must, in the end, judge her appeal in the light of *S.L.G.*'s strict standard.

## V.

### A.

R.S. argues that the trial court erred in terminating her parental right to custody of J.P., without applying the "parental presumption" of fitness.  To the

---

[16] *Id.* (emphasis added); *accord In re J.J.*, 111 A.3d at 1045 (affirming trial court's waiver of natural parent's consent to adoption based on "equivalent findings" that parent was unfit).

contrary, the magistrate judge, whose findings and conclusions were confirmed by the reviewing judge, acknowledged in the first sentence of her Conclusions of Law "the presumption . . . that a child's [best] interests will be served by being with his or her [natural] parent."[17]  In applying the presumption, however, the magistrate judge (ruling before our decision in *S.L.G.*) did not "expressly" determine whether R.S. was — or was not — "fit" to resume custody of J.P.  To justify termination of R.S.'s parental rights, therefore, the trial court's findings must be "equivalent" to findings that would support a conclusion of law, based on statutory TPR criteria, that R.S. was not fit to retain J.P. as her son.

The magistrate judge issued 97 detailed findings of fact, followed by 10½ pages with comprehensive conclusions of law, applying TPR factors (1), (2), (3) and (5).  (Factor (4) was irrelevant given J.P.'s young age.)  On review, the associate judge concluded that "the [magistrate judge] did not abuse [her]

---

[17]  The court cited *In re S.G.*, 581 A.2d 771, 785 (D.C. 1990).  Counsel for G.A.P. argues that because R.S. "never raised" the parental presumption at trial, that issue "is not properly before" this court, citing *In re H.B.*, 855 A.2d 1091, 1096 (D.C. 2004).  The magistrate judge, however, recognized that the parental presumption is inherent in the case and addressed it accordingly.

discretion when [she] found clear and convincing evidence to justify terminating [R.S.'s] parental rights and granted [G.A.P.'s] petition for adoption."[18]

Although R.S. is unable to demonstrate from the record on appeal that the magistrate judge failed to apply the parental presumption of fitness, she has challenged on appeal the adequacy of the trial court's findings, approved by the reviewing judge, in two (and only two) respects:  (1) the court's failure to justify the mother's continuing custody of J.P.'s brother, Ja.S., but not J.P., and (2) the court's findings supporting the conclusion that R.S. had "a history of and continuous use of Marijuana."  But for these two alleged errors, therefore, R.S. does not dispute that the trial court's findings are "equivalent" to the level of "express" findings required (by *S.L.G.*) to demonstrate, by clear and convincing evidence, that R.S. is no longer "fit" to retain parental custody of J.P.[19]

---

[18]  For the second issue raised by R.S., see *supra* Part II. — an issue not addressed directly to particular findings of fact — the reviewing judge concluded that there was "no basis to reverse the [magistrate judge's] decision based on the absence of any additional mental health evaluation."  See *infra* Part VI.

[19]  Absent a challenge, we need not address the trial court's other findings. Having concluded that TPR factor (4) ("the child's opinion of his or her own best interests") is inapplicable because of J.P.'s young age, and concluding below that factor (5) (evidence of "drug related activity") was thoroughly evaluated and cuts very much against R.S.'s continued parental custody of J.P., we briefly add for the record our reasons why the trial court findings and conclusions as to TPR factors (1), (2), and (3), constitute equivalent findings of unfitness as required by *S.L.G.*,

(continued . . .)

**B.**

As to the first contention, the fact that Ja.S. has not been removed from R.S.'s custody, despite CFSA oversight, does not necessarily support a finding that R.S. is fit to parent J.P. (or Ja.S. for that matter).  In fact, R.S. admits in her brief

_____

(. . . continued)

and similarly support, with clear and convincing evidence, the trial court's decision to waive R.S.'s parental consent to G.A.P.'s adoption of J.P.:

(1) (*"child's need for continuity of care and caretakers and for timely integration into a stable and permanent home"*) (*e.g.*, J.P was "removed from his mother's care when he was six-months old.  He is now four years old. . . . [R.S.] has not demonstrated an ability to create a safe and stable living environment for [J.P.] . . . . [R.S.] failed to maintain visitation under consistently safe conditions. . . . [R.S.] failed to address her own mental health issues . . . . [R.S.] never demonstrated an understanding of her need to participate in services; . . . . [J.P.] has lived with [G.A.P.] continuously and without interruption since August 2013 and has thrived in his care".).

(2) (*"physical, mental, and emotional health of all individuals involved"*) (*e.g.*, "[R.S.] has significant mental and emotional issues that she has not fully addressed. . . . [R.S.] has been diagnosed with Bipolar Disorder by three different, unrelated medical professionals. [R.S.] does not believe she has a mental illness. As a result, she has not consistently attended therapy nor has she been compliant with her medication management as ordered. . . . Dr. King . . . testified that individuals with unmanaged bipolar disorder suffer from impairment of daily functioning and often come to the attention of law enforcement". . . . [G.A.P.] is in good physical and mental health.).

(3) (*"quality of the interaction and interrelationship of the child with his or her parent, siblings, . . . foster parent"*) (*e.g.*, J.P. and R.S. "do not have a parent-child bond. . . . [R.S.] repeatedly demonstrated that everything in her life took priority over her relationship with her son"; J.P and G.A.P. "have a loving and bonded relationship.  They spend substantial quality father-child time together.").

that Ja.S. has some problems, given his "school absences and occasional discord in the home." This admission is based on the magistrate judge's findings that Ja.S. had missed 25 days of school during the year, that R.S. was unresponsive to the school's expressed concerns about him, and that Ja.S. had been at the center of an incident of domestic violence, which showed an "inability [of R.S.] to ensure Ja.S.'s physical safety." Furthermore, the magistrate judge found that Ja.S. and J.P., while amicable toward each other, had "limited interaction." In short, the trial court's findings raised serious questions about the care received by Ja.S. from his mother and discounted J.P.'s relationship with his brother — a situation that cuts against R.S.'s argument that her custody of Ja.S. supports her fitness to parent J.P.

## C.

Now to marijuana. The fifth TPR factor, "evidence that drug-related activity . . . exist[s] in a child's home environment," shall be given "great weight."[20] According to R.S., the trial court erred in "conclud[ing] that drug-related activity exists in the child's home." R.S. stresses that there was no evidence that she "was under the influence of any substance while supervising her children." The trial court essentially found otherwise. The court had ordered R.S.

---

[20] D.C. Code § 16-2353(b)(5).

"to submit to weekly drug tests," but she "failed to show up for [them] at least 26 times since [J.P.] was removed from her care." Moreover, R.S. "tested positive for marijuana at least 18 times since [J.P.] has been in foster care," and drug tests showed "water loads" on occasion that suggested R.S. had "tried to defeat the drug testing system to conceal her drug use."[21]

R.S. does not contest these particular findings, and thus the evidence is strong that she deliberately ignored court-ordered abstinence from drug use as a condition of her continued custody of J.P. The fact that marijuana may not be a "hard" drug (as R.S. put it) in comparison with cocaine or heroin, for example, is beside the point; she does not dispute that she was under court drug-testing orders intended to interdict *all* drug-related activity. For that reason as well, the fact that the District of Columbia had come to legalize recreational use of marijuana under specified circumstances[22] is also beside the point. And in any event, aside from

---

[21] Although there was no explicit finding that R.S. was "under the influence" while supervising her children, Dr. Craig King, the District's expert witness in the field of clinical psychology, testified that R.S. was "cannabis dependent." *See also In re K.L.*, No. 12-13-00334-CV, 2014 Tex. App. LEXIS 1781, *7 (Tex. App. Feb. 19, 2014) ("A fact finder may reasonably infer from a parent's repeated refusals to drug test that the parent was using drugs.").

[22] *See* D.C. Code § 48-904.01(a) (2015 Supp.) (implementing Ballot Initiative 71, which legalizes, for persons 21 years of age or older, possession, use,

(continued . . .)

asserting that marijuana is not a "hard" drug, R.S. does not explain how her particular use of that substance would fall within protection of the marijuana statute she cites.[23] Nor does she address the fact that the marijuana legislation became effective after the magistrate and reviewing judges had ruled.[24] Her marijuana argument accordingly fails.

## VI.

As noted earlier, R.S. raised a second issue before the reviewing judge (who rejected it),[25] and she renews that alleged error here: the magistrate judge's refusal

_____

(. . . continued)

purchase, or transport of up to two ounces of marijuana; transfer (without remuneration) of one ounce or less of marijuana; and possession or growth of no more than six marijuana plants at one's principal residence).

[23] *See id.*

[24] After conclusion of the adoption proceeding, the magistrate judge issued her written Findings and Conclusions on June 30, 2014, followed by the reviewing judge's Order affirming the adoption on October 24, 2014. The statute legalizing limited use of marijuana became effective on February 26, 2015. *See* "Legislative History of Law 20-153," D.C. Code § 48-904.01(a) (June 2015 Cumulative Supp. at 9).

[25] See *supra* note 17.

to grant R.S.'s motion for a second, independent assessment of her psychological health and parenting ability. We perceive no abuse of trial court discretion.[26]

As R.S. herself has noted, the trial court has discretion to "order additional mental examinations to be performed by independent experts upon a showing by any party that a prior examination is inadequate."[27] In our view, R.S. fails to demonstrate the inadequacy of her psychological assessment by Dr. Craig King, who not only had provided a written assessment on January 21, 2012, but also testified at trial on March 5, 2014, subject to cross-examination by counsel for R.S.

R.S. justifies her contention largely because Dr. King's evaluation had occurred over two years before trial of the adoption petition. That rationale, in itself, is insufficient to demonstrate its inadequacy. The only substantive argument

---

[26] In her opening brief on appeal, R.S. also claims a violation of constitutional due process, citing Supreme Court cases such as *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion), which noted that the right of parents to raise their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court," and *Santosky v. Kramer*, 455 U.S. 745, 754 (1982), which recognized that "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." R.S., however, does not contend that the trial court's discretionary administration of the statute at issue here, D.C. Code § 16-2315(e)(3), is not a fundamentally fair procedure; her complaint is directed, rather, at the content of Dr. Craig King's 2012 assessment, not the subject of a due process violation.

[27] D.C. Code §16-2315(e)(3).

in R.S.'s motion was a representation that, because R.S. no longer was living in an environment of domestic violence and had "made progress in mental health therapy, specifically, to address her extensive history of being a victim of domestic violence[,] . . . an updated psychological assessment would show substantial improvement." That generalization, however, limited to domestic violence, does not on its face have much currency, because it does not bear directly on R.S.'s two most fundamental problems, which the proffer does not address but Dr. King covers at length: R.S.'s untreated bipolar disorder and her continuing drug abuse.

R.S. proffered nothing to the magistrate judge to indicate that she had taken meaningful steps to manage her bipolar disorder — evidence that might have justified the need for an updated psychological assessment. To the contrary, as the magistrate judge found, and R.S. does not dispute, R.S. had "fail[ed] to take medication consistently or participate in therapy for her illness because she [did] not believe that she ha[d] Bipolar Disorder."[28] With regard to substance abuse,

---

[28] R.S. acknowledged on deposition that she was "a depressed person" who "might need to forever always have someone around to talk to, to consult with, to make me — you know, help me get through, you know, tough passes in life. . . . I do not believe I am a bipolar person." Later, at trial, R.S. testified that she did not believe she had "mental health issues." The magistrate judge disagreed, finding that, including Dr. King, R.S. "ha[d] been diagnosed with or treated for Bipolar Disorder by three different, unrelated medical professionals." The magistrate judge relied on testimony from both R.S. and Dr. King. R.S. acknowledged at trial

(continued . . .)

R.S. does not dispute the findings that she failed to attend weekly drug testing on 26 occasions, failed 18 drug tests, and attempted to conceal drug use through "water loading." As to these two fundamental psychological issues, therefore, there was nothing to update; those issues would remain whether R.S. was free from domestic violence or not. We cannot gainsay the reviewing judge, who concluded that R.S., in her motion, "ha[d] not proffered any information about [Dr. King's] evaluation, the methodology used, or the examiner's qualification that would render inadequate the psychological evaluation used at trial."

The reviewing judge also concluded that R.S., in any event, had "failed to show how the absence of an additional mental health evaluation might have prejudiced her." The judge stressed that R.S. had called her own therapist, Sheila Douglas, as a fact witness, not as an expert, without proffering how Ms. Douglas would have been inadequate, through qualifications or otherwise, to question Dr. Craig's credentials or rebut his evaluation.

_____

(. . . continued)

that she had been diagnosed with bipolar disorder by Community Corrections in 2010 and by Dr. King during his 2012 evaluation. R.S. also testified that she had been prescribed medication for bipolar disorder by Dr. Todd Christiansen from September 2013 to April 2014. Dr. King's report was based on an interview with R.S. as well as a review of 18 documents, at least seven of which pertain to R.S.'s mental health, including five documents from Community Corrections.

In her motions before the magistrate judge for an Independent Evaluation to Assess Mother's Parenting Ability, counsel explained why R.S.'s personal therapist would not be called to supply the required expertise to challenge Dr. King. That therapist, stressed counsel, could not have been used because of R.S.'s desire not to have "her current therapist . . . deposed by Petitioner[,] in order to maintain the confidential relationship with her therapist." In her submissions on appeal, however, R.S. did not incorporate that point when alleging that the trial court erred in failing to appoint a second, independent psychological assessment; that is to say, she does not quarrel with the reviewing judge's limitation of the point to evaluating prejudice, not antecedent error. But even if we were to characterize it as a claim of error, we would find no merit to it, and, absent error, no prejudice requiring reversal.[29] As noted above, R.S. proffered only a reduced-domestic-violence rationale to support her motion for a second psychological assessment — a rationale too weak, indeed ostensibly irrelevant, to show that Dr. King's evaluation has become "inadequate,"[30] given the ongoing failure of R.S. to address the bipolar and substance abuse problems that Dr. King confirmed.

---

[29] *See Johnson v. United States*, 398 A.2d 354, 365-66 (D.C. 1979).

[30] See *supra* note 25.

If R.S. had either proffered that her personal therapist was unqualified to provide the assessment, or proffered that her therapist *was* qualified but unavailable to provide specified, relevant testimony, then the trial court would have had to determine whether to appoint a second expert, or to leave R.S. with the decision whether her therapist should testify as an expert as well as fact witness. As matters stand, however, R.S. did not force the issue, and thus we can discern no error and resulting prejudice — no abuse of discretion — in the court's refusal to appoint a second, independent expert for R.S.

*****

Our inquiry, therefore, is at an end. For the reasons set forth above, the judgment of the trial court is affirmed.

*So ordered.*